Beverly P. DAVIS, wife of/and Willie Earl Davis, Plaintiffs–Appellees,

v.

ODECO, INC., Defendant,

Murphy Exploration & Production Company, originally sued as Odeco, Inc., Defendant–Appellant.

No. 92–9529.

United States Court of Appeals, Fifth Circuit.

April 4, 1994.

Suggestion for Rehearing En Banc Denied May 3, 1994.

Wilton E. Bland, III, Maurice C. Hebert, Jr., Alan G. Brackett, Hebert, Mouledoux & Bland, New Orleans, LA, for defendant-appellant.

David A. Bowling, Wilson & Bowling, New Orleans, LA, Wm. D. Boerner, Boerner & Breeland, Brookhaven, MS, for plaintiffs-appellees.

Before VAN GRAAFEILAND *, SMITH, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff–Appellee Willie Earl Davis (Davis) and his wife sued Defendant–Appellant Murphy Exploration & Production Company (Murphy Co.),[1] alleging that Murphy Co. contravened the Jones Act and general maritime law by exposing him to hydrocarbons while he worked aboard its vessels. Davis contends that this exposure caused him to contract Goodpasture's Syndrome (GPS), a rare disease with renal, pulmonary, and auto-immune symptoms. Davis won a $675,600.00 jury verdict, and the district court entered a judgment for Davis in that amount. Murphy Co. timely appealed, positing that the district court committed 19 reversible errors in the course of the trial.

I

FACTS AND PROCEEDINGS

Davis worked for Murphy Co. for approximately ten years as a roustabout, a floor-

---

* Circuit Judge of the Second Circuit, sitting by designation.

1. Although Murphy Co. was formerly known as ODECO, Inc., throughout this opinion we shall refer to the Appellant as Murphy Co., even when referring to events that took place when it was known as ODECO, Inc.

hand, and a shaker hand—all positions involving unskilled labor. During that time, he worked aboard thirteen different Murphy Co. vessels. In November 1989, while aboard the Ocean Titan, Davis coughed up blood. Although contemporaneous records of Davis' medical treatment reveal that he had abnormally high concentrations of protein and blood in his urine, he was not advised that he had any serious health problems, and he went back to work.

On February 23, 1990, however, just before boarding the Ocean America, Davis again felt sick. Five days later he collapsed and was promptly evacuated by Murphy Co. to West Jefferson Medical Center where he was admitted in critical condition. For a time medical specialists were unable to diagnose Davis' condition, although they were able to rule out a number of diseases, including Legionnaire's disease and AIDS. Ultimately, Davis was diagnosed as having GPS, an uncommon condition comprising three disease components: kidney disease, lung disease, and autoimmune disease.[2] During his illness, Davis received $174,259.68 in medical and disability payments from the Group Insurance Plan (the Plan), which was established (and largely funded) by Murphy Co. to compensate employees for nonwork-related accidents and illnesses.[3] Davis ultimately filed a complaint in district court, contending that his exposure to hydrocarbons while working for Murphy Co. caused him to develop GPS.[4] Although medical evidence exists

that links development of GPS with exposure to hydrocarbons, a causal relationship between such exposure and development of GPS has not been firmly established.[5] Davis nevertheless asserted that Murphy Co. was negligent in failing to (1) provide him with a respirator, (2) train him to use a respirator, and (3) require him to use a respirator, all the while forcing him to work with compounds rich in hydrocarbons. He also averred that Murphy Co. was negligent *per se* in violating Coast Guard Regulations that required Murphy Co. to (1) have a written policy regarding use of respirators, (2) fit-test employees annually to ensure that their respirators fit properly, and (3) perform air monitoring for hazardous substances and medical monitoring of employees for signs of exposure to such substances. Finally, Davis alleged that several of Murphy Co.'s vessels aboard which he served were "unseaworthy," essentially for the same reasons that Murphy Co. was allegedly negligent.

After the district court ruled on a barrage of pre-trial motions, the case went to trial, with Davis winning a verdict. The jury concluded that Murphy Co. had been both negligent and negligent *per se,* and that several of the Murphy Co.'s vessels had been unseaworthy. The jury awarded Davis a total of $675,600.00 in damages and maintenance, as follows: $300,000 for past pain and suffering, $100,000 for future pain and suffering, $30,000 in past lost wages, $43,000 in future lost wages, $142,000 for past medical expenses,

2. GPS apparently has an estimated incidence rate of about one case per two million individuals. Only about 500 cases have been documented worldwide since 1919.

3. The Plan actually subsumed two plans: the Major Medical Plan (90% funded by Murphy Co.) and the Accident and Sickness Plan (100% funded by Murphy Co.).

4. One of Davis' duties was to spray paint things, and he testified that he was often covered with paint that contained hydrocarbons. Additionally, he worked with paint thinners and diesel fuel, both of which are essentially hydrocarbon mixtures.

5. Case reports, longitudinal studies, and animal experiments all *suggest* a correlation between exposure to hydrocarbons and development of GPS. Some scientists opine that "although there

may be some doubt, ... the evidence supports a causal relationship" between hydrocarbons and GPS. Others aver, however, that the evidence is not sufficient to support a causal nexus. Obviously, then, doubt persists about the causal relationship between exposure to hydrocarbons and development of GPS, although there is sufficient evidence upon which a jury might reach a verdict.

If the basic causal connection between exposure to hydrocarbons and development of GPS remains in doubt, then the precise molecular mechanism for that putative disease process is obviously unknown. Some believe that the hydrocarbons themselves damage the tissues, with the patient's immune system then recognizing and attacking those damaged tissues epiphenomenally. Others speculate that the hydrocarbon molecules insinuate themselves into the membranes of healthy cells, thereby turning them antigenic and stimulating autoimmunity.

$48,000 for future medical expenses, and $12,600 for maintenance. The court duly entered judgment for $675,600.00, and Murphy Co. timely appealed, contending that the district court committed nearly a score of reversible errors in the course of the trial.

## II

## ANALYSIS

After carefully considering the facts and legal arguments advanced by counsel in their briefs to this court and in their oral arguments to this panel, and after reviewing the record from the district court, we conclude that the majority of the 19 claims of error advanced by Murphy Co. on appeal—while not frivolous—lack sufficient factual and legal substance to justify reversing the district court and are not here entitled to elaborate treatment. Several issues, however, do merit more extensive discussion, and we proceed to consider these.

### A. *Fault or Breach of Standard of Care*

■ Davis essentially asserted two causes of action in this case: negligence under the Jones Act, and the unseaworthiness of Murphy Co.'s vessels under general maritime law. To establish negligence under the Jones Act, Davis also averred that Murphy Co. violated applicable Coast Guard regulations, and thus was negligent *per se*.[6] The jury found that Murphy Co. was negligent and negligent *per se* "in the manner claimed by the plaintiff." The jury also found certain of Murphy Co.'s vessels to have been unseaworthy. On appeal, Murphy Co. argues, inter alia, that the evidence was insufficient to support the jury's verdict.

■ We may overturn the jury's determination that some of Murphy Co.'s vessels were *unseaworthy* only if the facts and inferences favor Murphy Co. so strongly that a reasonable jury could not have reached a verdict for Davis.[7] In contrast, as Davis' *negligence* claims were brought under the Jones Act, the jury's verdict that Murphy Co. was negligent and negligent *per se* must stand unless "there is a complete absence of probative facts to support the verdict."[8] Consequently, we must not disturb the verdict unless Davis failed to advance even a marginal claim for relief.[9] We have appropriately labeled this burden as "featherweight."[10]

As the jury did not apportion damages among applicable legal theories, we must affirm the jury's award—and the judgment of the district court—if the verdict is supportable under any legal theory advanced by Davis. Because the "complete absence of supporting probative facts" standard is appreciably more deferential to jury verdicts than the reasonable jury standard, we need only consider whether Davis adduced sufficient evidence to meet the "featherweight" burden under the Jones Act.[11] We conclude that he did.

Although Murphy Co. vigorously contested Davis' allegations that it was negligent for failing to provide him with a respirator, to train him to use a respirator, and to require him to use a respirator at all relevant times, we cannot say that our review of the record reveals the complete absence of probative facts that is required to overturn a verdict

---

6. It does not really matter whether we regard negligence per se as a distinct cause of action or a means of establishing a violation of the appropriate standard of due care. Rarely does anything turn on this distinction because, however the theory is characterized, a plaintiff must nonetheless prove causality and damages.

7. *See, e.g., Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc); *accord Phillips v. Western Co. of North America*, 953 F.2d 923, 927 (5th Cir.1992).

8. *Bommarito v. Penrod Drilling Corp.*, 929 F.2d 186, 188 (5th Cir.1991) (citing *Thornton v. Gulf*

*Fleet Marine Corp.*, 752 F.2d 1074, 1076 (5th Cir.1985)). Significantly, the parties agree that Davis is properly classified as a seaman; Davis' claim thus fell within the purview of the Jones Act.

9. *See, e.g., Springborn v. American Commercial Barge Lines, Inc.*, 767 F.2d 89, 98 (5th Cir.1985); *Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110, 1120 (5th Cir.1984).

10. *Bommarito*, 929 F.2d at 188.

11. *Id.*

under the Jones Act.[12] At trial, Murphy Co. did introduce convincing evidence that respirators were available for Davis' use, that Davis knew how to use a respirator, and that Murphy Co. had a policy requiring its employees to use respirators at appropriate times. Nonetheless, there was not a complete absence of probative fact supporting Davis' allegations, and we are therefore constrained to uphold the jury's verdict.

Moreover, Murphy Co. did not adequately respond to Davis' contention that it was negligent *per se*. Davis argued that Murphy Co. was negligent *per se* under the Jones Act because it violated applicable Coast Guard Regulations (hereinafter "ANSI standards")[13]—effective January 12, 1987—that established a standard of care requiring Murphy Co. to (1) have a *written* policy regarding use of respirators, (2) fit-test employees annually to ensure that their respirators fit properly, and (3) perform air monitoring for hazardous substances and medical monitoring of employees for signs of exposure to such substances.[14] In response to these arguments, Murphy Co. asserts that its policies regarding use of respirators were stricter than those imposed by the ANSI standards because Murphy Co. required (presumably through an unwritten policy) that "respirators be used at *all* times."[15]

This response is, however, something of a non sequitur. The ANSI regulations did not require Murphy Co. to enact respirator use policies of a given arbitrary stringency. Rather, they required Murphy Co. to establish a *written* policy concerning use of respirators. Murphy Co.'s response is thus feckless. Additionally, Murphy Co. did not even allege that it complied with the ANSI standards requiring fit-testing and air monitoring. Indeed, Murphy Co. conceded that it may not have "follow[ed] the ANSI standards to the letter." Murphy Co. thus appears unable convincingly to gainsay the jury's finding that Murphy Co. violated applicable Coast Guard Regulations and was thus negligent *per se*. As there was not a complete absence of probative facts to support the jury's determination that Murphy Co. was negligent and negligent *per se* under the Jones Act, we will not upset the jury's finding that Murphy Co. breached the applicable standard of care.

## B. *Causality*

■ Murphy Co. also asserts that "the jury lacked sufficient evidence to find medical causation." We agree that the evidence supporting the hypothesis that exposure to hydrocarbons causes GPS is inconclusive. Obviously then, the evidence supporting the narrower premise that Davis' exposure to hydrocarbons induced his GPS is even more tenuous. But again, there was not a complete absence of probative factual evidence on the issue of medical causation—as there must be to overturn a jury verdict under the Jones Act.[16] Significantly, Davis is entitled

**12.** *Id.* Davis himself testified that Murphy Co. had not always made respirators available, had never trained him to use one, and had not always required him to wear one when working with hydrocarbons.

**13.** ANSI is an acronym that stands for "American National Standards Institute." See *infra* note 14 for a discussion of how these standards were incorporated into the Coast Guard Regulations.

**14.** The relevant regulatory provision, ANSI z88.2—1980, details a standard operating procedure for use of respirators in certain work environments. As of January 12, 1987, ANSI z88.2 was incorporated into the Coast Guard Regulations. 51 Fed.Reg. 28,381 (1986); 33 C.F.R. 142.39. In view of this incorporation, the district court "reach[ed] the inevitable conclusion that the ANSI z88.2–1980 standards relative to respiratory protection applied without limitation to [Murphy Co.] subsequent to January 12,

1987." Murphy Co. does not here dispute the district court's conclusion. Informed in the course of trial of the applicability of the ANSI z88.2–1980 standards to Murphy Co.'s conduct, the Jury found Murphy Co. negligent *per se* in violating those standards, which were intended to benefit workers such as Davis.

**15.** Emphasis in Murphy Co.'s Brief.

**16.** *Bommarito*, 929 F.2d at 188 (citing *Thornton v. Gulf Fleet Marine Corp.*, 752 F.2d 1074, 1076 (5th Cir.1985)). At trial, Davis called three medical experts to testify to the causal relationship between exposure to hydrocarbons and development of GPS. Dr. Garth Kirkwood, a nephrologist who treated Davis, opined "that it is more probable than not that Mr. Davis' hydrocarbon exposure played a contributory causal role in his development of Goodpasture's Syndrome." These experts also cited several studies that discuss the relationship between exposure to hydro-

to recovery under the Jones Act if he adduced probative evidence that Murphy Co.'s negligence played *any part*—however small—in the development of his condition.[17] Moreover, the jury was entitled to infer causation from unexplained events.[18] Whether we believe that Davis' evidence of a causal nexus between his exposure to hydrocarbons and his development of GPS preponderates is irrelevant. He clearly proffered *some* evidence of such a nexus, and that is all that is required to survive appellate review of a favorable verdict on a Jones Act negligence claim.[19]

## C. *The Collateral Source Rule*

The district court ruled that the Plan, which was established and largely funded by

Murphy Co., was a "collateral source" and, consequently, that Plan payments received by Davis could neither be set-off against the jury's award of damages nor brought to the attention of the jury.[20] Murphy Co. insists that both aspects of this ruling were erroneous.

The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor.[21] Married to this substantive rule is an evidentiary rule that proscribes introduction of evidence of collateral benefits out of a concern that such evidence might prejudice the jury.[22] Murphy

---

carbons and development of glomerulonephritis (GN)—a kidney disease essentially identical to the renal disease component of GPS. Additionally, Davis cited articles in medical journals that assert the existence of a causal relationship between exposure to hydrocarbons and development of GPS. Admittedly, the evidence supporting Davis' contention that exposure to hydrocarbons induced his development of GPS is underwhelming. It is, however, sufficient to support the jury's verdict under the Jones Act's featherweight standard.

**17.** *See, e.g., Rogers v. Missouri Pacific R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957) (discussing the standard of review under the Federal Employers' Liability Act (FELA), which was incorporated into the Jones Act); *see also Kernan v. American Dredging Co.,* 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (defendant is liable when injury to worker is caused—in whole or in part—by defendant); Ellen M. Flynn et al., 1B *Benedict on Admiralty* § 21 (6th ed. 1993) (Jones Act requires only that defendant's negligent act or omission have played any part—even the slightest—in producing plaintiff's injury).

**18.** *Landry v. Two R. Drilling Co.,* 511 F.2d 138, 142 (1975) (citing *Johnson v. United States,* 333 U.S. 46, 49, 68 S.Ct. 391, 393, 92 L.Ed. 468 (1948)).

**19.** Clearly, a defendant's best hope of defeating a Jones Act negligence claim is at trial.

**20.** The collateral source rule is "plainly applicable in Jones Act negligence cases." *Phillips v. Western Co. of North America,* 953 F.2d 923, 930 (5th Cir.1992) (citing *Tipton v. Socony Mobil Oil Co.,* 375 U.S. 34, 35, 84 S.Ct. 1, 2, 11 L.Ed.2d 4 (1963) (per curiam)); *Bourque v. Diamond M*

*Drilling Co.,* 623 F.2d 351, 354 n. 2 (5th Cir. 1980).

**21.** *Phillips,* 953 F.2d at 929. One underlying rationale for the collateral source rule is that plaintiffs should not be penalized because they had the foresight and prudence (or good fortune) to establish and maintain collateral sources of compensation. *Phillips,* 953 at 930. If tortfeasors could set off compensation available to plaintiffs through collateral sources, then plaintiffs who pay their own insurance premiums would suffer a net loss because they would derive no benefit from any premiums paid. *Lomax v. Nationwide Mut. Ins. Co.,* 964 F.2d 1343, 1347 (3rd Cir.1992). Additionally, such plaintiffs might be left exposed to other misfortunes once their insurance coverage was depleted by the tortfeasors' negligence. *Phillips,* 953 F.2d at 930. Moreover, even when third parties pay the compensation for plaintiffs' injuries, such payment should not have the effect of giving a windfall to tortfeasors. The liability of tortfeasors should not be excused or reduced simply because other sources of compensation are available. *Quinones v. Pennsylvania Gen. Ins. Co.,* 804 F.2d 1167, 1171 (10th Cir.1986). Permitting tortfeasors to set-off compensation available to plaintiffs from collateral sources would allow them to escape bearing the costs of their own conduct. Additionally, some courts emphasize that the collateral source rule prevents the deterrent effect of tort judgments from being undermined. *Phillips,* 953 F.2d at 930. Properly interpreted, however, the collateral source rule also prevents tortfeasors from paying twice for the same injury—a result that would achieve both overdeterrence and overcompensation. *Thomas v. Shelton,* 740 F.2d 478, 484–85 (7th Cir.1984); *accord Phillips,* 953 F.2d at 931; *Perry v. Larson,* 794 F.2d 279, 286 (7th Cir.1986).

**22.** *Phillips,* 953 F.2d at 930.

Co. contends that the district court erred in not allowing it to deduct Plan payments received by Davis from Davis' damage award, and in not allowing it to introduce to the jury evidence of such payments. We proceed to discuss first the issue of offset or deduction.

Sources of compensation that have no connection to the tortfeasor are inevitably collateral. The characterization of sources of compensation to which the tortfeasor contributes, however, is more problematic: such sources may be—but are not necessarily—collateral.[23] Although a bright-line test allowing a tortfeasor to reduce its liability to an employee by the amount of compensation paid would have the virtue of simplicity, such a test could yield absurd results. For example, should the salary paid by an employer—tortfeasor be allowed to offset damages awarded to an employee plaintiff because of the employer's negligence? Obviously not. Yet a myopic fixation on the source of compensation in analyzing the collateral source rule could produce such bizarre results.

 Generally speaking, when a employee has bargained for a fringe benefit as additional consideration for employment, compensation received by the employee under that fringe benefit should not be deducted from damages awarded to the employee as a result of the employer's negligence.[24] As the employee is already contractually entitled to that benefit, allowing the employer to deduct such compensation would both undercompensate the employee and provide the employer with an undeserved windfall.[25] Thus, in evaluating whether a benefit derives from a collateral source, we ordinarily assess whether that benefit is in the nature of a

fringe benefit (or deferred compensation) or instead reflects a tortfeasor's effort to anticipate potential legal liability.[26] Current application of the collateral source rule thus turns on the *character* of the benefits received, as well as the *source* of those benefits.[27]

 In *Phillips*, we articulated several factors that assist in distinguishing fringe benefit plans from benefit plans intended to respond to legal liability: (1) whether the employee contributes to the plan, (2) whether the benefit plan stems from a collective bargaining agreement, (3) whether the plan covers both work-related and nonwork-related injuries, (4) whether payments under the plan correlate with the employee's length of service, and (5) whether the plan contains specific language requiring that benefits received under the plan be set-off against a judgment adverse to the tortfeasor.[28] These factors must not, however, be applied woodenly: In determining whether a benefit plan that is wholly or partly funded by the tortfeasor is a collateral source, the ultimate inquiry remains whether the tortfeasor established the plan as a prophylactic measure against liability.

In this case, determining whether the Plan is a collateral source presents a close question: neither party has referred us to precedents that neatly dispose of the issue, and we are aware of none. Applying the *Phillips* (actually the *Allen*) factors to the instant case, the district court concluded that the Plan constituted a collateral source. Although the court acknowledged several factors that militate against finding the Plan to be a collateral source,[29] it ultimately held

**23.** *Id.* at 931.

**24.** *See, e.g., E.E.O.C. v. Grady,* 857 F.2d 383, 391 (7th Cir.1988) (pension benefits were collateral source, even though employer contributed to fund from which benefits were paid, because they were "part of claimants' compensation"); *In re Air Crash Disaster Near Chicago, Illinois, On May 25, 1979,* 803 F.2d 304, 308 (7th Cir. 1986) (life insurance policy was as much a part of employee's compensation as his salary, fringe benefits, and pension benefits); *Haughton v. Blackships, Inc.,* 462 F.2d 788 (5th Cir.1972) (trial court erred in deducting benefits received under seaman's maritime pension from damages

awarded to seaman because of employer's negligence).

**25.** *See ante* note 19.

**26.** *Phillips,* 953 F.2d at 932.

**27.** *Haughton,* 462 F.2d at 790.

**28.** *Phillips,* 953 F.2d at 932 (citing *Allen v. Exxon Shipping Co.,* 639 F.Supp. 1545, 1548 (D.Me. 1986)).

**29.** Those factors are that (1) Murphy Co. had funded 90% of the Major Medical Plan and 100%

that the Plan was a collateral source because (1) Davis contributed 10% to the funding of the Major Medical portion of the Plan, (2) the Plan applied *exclusively* to nonwork-related injuries, and (3) the Plan lacked explicit language requiring Plan benefits to offset any liability incurred by Murphy Co. We review *de novo* the district court's conclusion that the Plan is a collateral source.[30]

Our plenary review convinces us that the district court was correct in holding the Plan to be a collateral source. Nevertheless, our affirmation of the district court should not be read to indicate that an employer may never insulate itself from liability by purchasing medical, accident, and disability insurance for its employees. In this case, however, the Plan's *exclusive* application to *nonwork-related* injuries is strong evidence that Murphy Co. did not establish the Plan to reduce its own legal liability. As an employer, Murphy Co. would not ordinarily be liable for non-work-related injuries. The Plan therefore applies only under circumstances in which Murphy Co. is unlikely to be found liable for the injuries or illnesses of its employees. Thus, the Plan does not appear to have been devised to reduce Murphy Co.'s legal liability for its employees' maladies. Rather, it is closely akin to a fringe benefit—part-and-parcel of its employees' compensation package.

We do not here attempt to delineate the exact circumstances in which we would hold that a medical and disability insurance plan, largely funded by an employer, is *not* a collateral source. We certainly do not want to discourage employers from taking prudent and wholesome prophylactic measures against potential liability: such prescience benefits both employer and employee. In this case, though, we are satisfied that the district court correctly held the Plan to be a collateral source, and—consequently—that payments received by Davis under the Plan should not offset damages awarded to Davis because of Murphy Co.'s negligence under the Jones Act.[31]

We are not satisfied, however, that the district court was correct in holding that Plan payments may not offset amounts awarded to Davis for maintenance and cure. But as the district court found—in the alternative—that Murphy Co. had failed timely to raise the defense of set-off, we affirm the district court. Nevertheless, we briefly discuss the issue of maintenance and cure *obiter dictum* to provide guidance in an area of law that is but sparsely populated with relevant jurisprudence.

Maintenance and cure is a seaman's right under general maritime law to receive food and lodging (maintenance) and necessary medical services (cure) if he falls

---

of the Accident and Sickness Plan (which together comprised the Group Insurance Plan that paid Davis $174,259.68 in benefits), (2) the Plan did not arise from a collective bargaining agreement, and (3) the Plan did not base medical and disability payments upon length of service.

**30.** If we were reviewing the district court's underlying factual findings—such as that Murphy Co. had funded 90% of the Major Medical Plan—such a review would be based on the clearly erroneous standard. Here, however, we are reviewing the district court's analysis and application of several criteria that together comprise a legal test for whether a benefit is a collateral source. Such a review is *de novo*, whether we regard the analysis as a purely legal question, *see, e.g., Leeper v. United States*, 756 F.2d 300, 303 (3rd Cir.1985) ("the gravamen of [Plaintiff's] argument is that the district court *misapplied* the law") (emphasis added), or as a mixed question of fact and law. *See, e.g., United States v. Altech, Inc.*, 929 F.2d 1089, 1092 (5th Cir.1991) (mixed question of fact and law is reviewed *de novo* ).

**31.** We share the district court's concern that requiring Murphy Co. to pay both Plan premiums and Davis' past and future medical expenses (as part of Davis' damage award) appears to be making Murphy Co. pay twice for the same injury in contravention of a fundamental policy underlying the collateral source rule. *See, e.g., Thomas v. Shelton*, 740 F.2d 478, 484–85 (7th Cir.1984); *accord Phillips*, 953 F.2d at 931; *Perry v. Larson*, 794 F.2d 279, 286 (7th Cir.1986). As noted above, however, when the benefit at issue was established and funded by the employer as additional compensation (i.e., as a fringe benefit), refusing to deduct benefit payments from the plaintiff-employee's damage award does not make the employer pay twice—any more than refusing to set off employee's salary would make the employer pay twice. Additionally, in this case the insurance company—*qua* subrogor—may well have the right to recover insurance payments wrongly received by Davis under the erroneous assumption that Davis' injury was nonwork-related. Ultimately, then, Davis may not be paid twice for the same injury.

ill while in the service of a vessel.[32] The owner of a vessel has a duty to pay maintenance and cure which is unrelated to any duty of care under tort law.[33] "Because of the unique nature of maintenance and cure, normal rules of damages, such as the collateral source rule in tort, are not strictly applied." [34]

■ Generally speaking, a seaman "may recover maintenance and cure only for those expenses actually incurred." [35] Despite this general rule, however, a shipowner is not entitled to set-off against an award for maintenance and cure all monies that a seaman receives.[36] In *Vaughan v. Atkinson,* for example, the Supreme Court held that a shipowner was not entitled to deduct monies earned by an injured seaman—who worked as a taxicab driver while his claim was pending—from the seaman's maintenance and cure award.[37] The Court reasoned that if a shipowner were permitted to disregard its obligation to provide maintenance and cure and then deduct money earned by the seaman during the pendency of his claim, the underlying purpose of a shipowner's duty to provide maintenance and cure—namely the protection of injured seamen—would be undermined.[38] Following the Supreme Court's reasoning, we held in *Gauthier* that when a seaman has *alone* purchased medical insurance, a shipowner is not entitled to deduct from its maintenance and cure obligation monies received by the seaman from his insurer.[39] Thus, while an injured seaman is not generally entitled to maintenance and cure when he does not incur any expense, the law establishes an exception—one which forbids the shipowner from escaping his obligation to provide maintenance and cure by referring to monies received by the seaman through his own efforts. In this case, however, the exception is inapplicable.

■ The record indicates that Davis contributed very little to the Plan established by Murphy Co. to pay for nonwork-related injuries: he paid 10% of the premiums for the Major Medical portion of the Plan and none of the premiums for the Accident and Sickness portion of the Plan. As the district court noted, it is undisputed that through these plans Davis "received payments sufficient to satisfy any food, lodging, or medical expenses." Thus, given that—as noted above—normal rules of damages, such as the collateral source rule in tort, are not strictly applied to awards for maintenance and cure,[40] the district court may have erred in concluding that Murphy Co. could not deduct these Plan disability payments from Davis' maintenance award. As the district court found in the alternative that Murphy Co. had waived its "set-off defense" by failing to plead it prior to the deadline for filing amended pleadings, however, we affirm the district court's denial of a set-off with respect to Davis' maintenance award as well.[41]

**32.** *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 527, 58 S.Ct. 651, 652, 82 L.Ed. 993 (1938); *see also generally* Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5–2 (1987 & Supp.1989) (discussing seaman's right to maintenance and cure).

**33.** *Adams v. Texaco, Inc.,* 640 F.2d 618, 620 (5th Cir.1981).

**34.** *Gauthier v. Crosby Marine Serv. Inc.,* 752 F.2d 1085, 1089 (5th Cir.1985).

**35.** *Id.* (citing *Field v. Waterman S.S. Corp.,* 104 F.2d 849, 851 (5th Cir.1939)). For example, in *Brown v. Aggie & Miller, Inc.,* we concluded that a seaman was not entitled to maintenance and cure because he had received care and treatment in a public hospital and thus had incurred no expense. 485 F.2d 1293, 1296 (5th Cir.1973). Similarly, in *Johnson v. United States,* the Supreme Court held that an injured seaman who received care and treatment from his parents was not entitled to maintenance and cure because he had not incurred any actual expense. 369 U.S. 527, 533, 82 S.Ct. 997, 1001, 8 L.Ed.2d 88 (1962).

**36.** *Gauthier,* 752 F.2d at 1090.

**37.** 369 U.S. 527, 533, 82 S.Ct. 997, 1001, 8 L.Ed.2d 88 (1962).

**38.** *Id.*

**39.** *Gauthier,* 752 F.2d at 1090.

**40.** *Gauthier,* 752 F.2d at 1089.

**41.** In his brief to this panel, Davis reiterated his contention that Murphy Co. "did not plead off-set, mistake, estoppel, payment or any other defense of an equitable nature" and thus waived these defenses. Murphy Co. never responded to this contention.

### D. *Other Assignments of Error*

Most of Murphy Co.'s remaining criticism involves alleged errors by the district court in refusing to permit Murphy Co. to introduce certain evidence or in allowing Davis to introduce certain other evidence. We review a district court's evidentiary rulings only for abuse of discretion [42] and here find no such abuse. One evidentiary issue was of special concern to us, however, so we discuss it in some detail.

Murphy Co. complains that its defense was prejudiced by the district court's refusal to allow admission of several health insurance claim forms (the Forms), which indicated that Davis' illness was *not* work-related. Murphy Co. contends that the admission of the Forms would have allowed it more effectively to dispute the central issue of medical causality, as well as to better impeach Davis' expert medical witness, Dr. Kirkwood.

The district court based its decision to exclude the Forms on several factors. First, it noted that Davis had himself filled out many of the Forms, and that he was not qualified under Federal Rule of Evidence 703 to offer expert testimony on the etiology of his condition. Second, as discussed above, the district court held that the Plan constituted a collateral source. As such, the court concluded, evidence of insurance payments simply had no relevance to the lawsuit.[43] Third, the district court found the probative value of the Forms to have been substantially outweighed by the danger of unfair prejudice and therefore excluded the Forms under Fed.R.Evid. 403.

Technically, the district court was probably incorrect in determining that the Forms literally had no relevance because they were evidence of a collateral source. As the Plan was a collateral source, the Forms were clearly not relevant (and could not be admitted) with respect to the issue of mitigation (or set-off) of damages. Yet, the forms may very well have been relevant with respect to the issue of medical causality.[44] But the district court also offered two additional grounds for excluding the Forms.

We find the district court's ruling based on Fed.R.Evid. 403 to be particularly defensible. The court indicated that—in its judgment—the Forms had very low probative value because they were filled out by Davis and by anonymous medical clerks relying on Davis' representations. The court also noted that the signatures of the attending physicians were rubber-stamped onto the Forms.[45] Moreover, the attending physicians submitted affidavits in which they declared that the Forms did not reflect their true medical opinions, thus further reducing the probative value of the Forms. On the other hand, the district court found that the Forms were highly prejudicial because "no juror ... will misunderstand the import of submitting a claim form to an insurance administrator." In view of these observations, we cannot say that district court abused its discretion in refusing to admit the Forms.

### III

### CONCLUSION

None of Davis' 19 claims of error justifies reversing the district court in this case. After carefully reviewing the record, we cannot say that Davis' Jones Act negligence claim is characterized by a complete absence of supportive, probative facts, and we are therefore constrained to affirm the jury's verdict that

---

42. *United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 625 (5th Cir.1992); *Wright v. Hartford Accident & Indem. Co.*, 580 F.2d 809, 810 (5th Cir.1978).

43. The district court cited *Phillips v. Western Co. of North America*, 953 F.2d 923, 930 (5th Cir. 1992), for the proposition that evidence of collateral sources has no relevance.

44. The district court doubtless could have admitted the Forms with a limiting instruction to the jury to the effect that the Forms could be considered with respect to the issue of medical causality and for impeachment, but not with respect to the issue of damages, i.e., set-off. Nonetheless, the district court's decision to exclude the Forms under Fed.R.Evid. 403 and 702 does not amount to an abuse of discretion.

45. Murphy Co. did ultimately present to the district court a few forms bearing Dr. Kirkwood's actual signature, but the court ruled this evidence to have been untimely presented.

Murphy Co. was negligent. Whether or not we are convinced that a scientifically verifiable causal nexus exists between exposure to hydrocarbons and development of GPS is irrelevant: we are not here to second-guess the jury as factfinder, and it found causation on the basis of "some" probative evidence. We also affirm the district court's conclusion that the Group Insurance Plan was a collateral source, even though it was funded almost entirely by Murphy Co. Although we emphatically do not wish to discourage employers from taking prophylactic measures against future liability, in this case, the fact that the Plan applied exclusively to nonwork-related injuries leads us inexorably to the conclusion that the Plan was conceived not as a hedge against liability but as a fringe benefit to further compensate employees. The verdict of the jury and the judgment of the district court are therefore AFFIRMED.