NUMBER
13-05-0033-CV

 

                                 COURT
OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI B EDINBURG

                                                                                                                       


SEARIVER MARITIME, INC.                                                             Appellant,

 

                                                             v.

 

ELLA PIKE,                                                                                        Appellee.

                                                                        
                                               

       On
appeal from the 189th District Court of Harris County, Texas.

                                                                                                                       


                               MEMORANDUM
OPINION

 

                         Before
Justices Castillo, Garza, and Wittig[1]








                     Memorandum
Opinion by Retired Justice Wittig

 

SeaRiver Maritime, Inc. appeals an adverse jury
verdict from the 189th Judicial District Court of Harris County.  The jury found in favor of appellee, Ella
Pike.  Pike fell and injured herself
shipboard in the galley during a storm. 
The jury found appellant liable under both general maritime law and the
Jones Act and awarded damages, past and future, totaling $2,564,912.  In four issues, SeaRiver challenges (1) the
jury=s findings of causation for the incident, (2) the
qualifications and reliability of the plaintiff=s
expert Dr. Robert Voogt, (3) the jury=s finding of $1,000,000 in future medical, and (4)
the trial court=s refusal to allow an offset for disability payments
to Pike in the amount of $175,207.  We
affirm the judgment as modified.

I. 
Standard of Review








The Jones Act requires proof of producing cause, and
general maritime law requires proof of proximate cause.  Johnson v. Offshore Express, Inc., 845
F.2d 1347, 1354 (5th Cir. 1988); Smith v. Trans-World Drilling Co., 772
F.2d 157, 162 (5th Cir. 1985).  Texas
courts utilize the federal standard of review for evidence sufficiency
challenges under the Jones Act.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 
402, 406 (Tex. 1998).  The purpose
of the Jones Act standard of review is to vest the jury with complete
discretion on factual issues about liability. 
Id.    Once the appellate
court determines that some evidence about which reasonable minds could differ
supports the verdict, the appellate court's review is complete.  Id. 
A Texas court of appeals may not conduct a traditional factual
sufficiency review of a jury's liability finding under the Texas "weight
and preponderance" standard.  Id.  The causation burden is "whether the
proof justifies with reason the conclusion that employer negligence played any
part, even the slightest, in producing the injury for which the claimant seeks
damages." Id. (citing Rogers v. Missouri Pac. R.R., 352 U.S.
500, 506‑07 (1957)).  The burden is
termed "featherweight."  Id.

II. 
DiscussionBCausation

SeaRiver points out that Pike did not testify as to
how she fell although her injury report indicated the ship rolled, grease
spilled on the deck, and her foot slipped on the grease.  Her doctor noted she slipped on the grease
and her leg was cut as her foot slipped under the door.  SeaRiver cites a Texas premises case, which
may apply in the general Aslip and fall@ context, but does not apply in maritime law.  SeaRiver argues:  (1) 
the conclusory opinion of Pike=s expert StewartBa
former seaman and now college professorBthat Pike would not have slipped had SeaRiver
provided rubber floor mats, is a naked and unsupported conclusion; (2) Stewart
was not qualified to opine about causation and his opinion did not assist the
jury; and (3) Stewart=s conclusory opinion is unreliable.  

Assuming, arguendo, that SeaRiver is correct
in its argument, we cannot agree that there is no other evidence regarding
causation to support the two separate liability findings.  As SeaRiver itself argues, the jury is
competent to determine the ultimate issues, even without an expert.  See K-Mart Corp. v. Honeycutt, 24
S.W.3d. 357, 361 (Tex. 2000); Peters v. Five Starr Marine Serv., 898
F.2d 448, 450 (5th Cir. 1990). 








The evidence is uncontradicted that, at the time of
the accident, the ship was weathering a storm of gale-force proportions.  The galley deck had slick glazed tile that
had been protected by rubber mats before their removal four months prior to the
accident.  New mats had been ordered but
had not yet arrived.  After the accident,
the old mats were replaced in the galley pending arrival of the new mats.  The Captain and engineer=s report pointed out that the glazed tiles used in
the galley were of the type found in residential homes, but the tiles were too
slick to be used on outdoor house entries. 
The report stated that spilled grease and water makes the tile surface
extremely slippery; the report concludes that the addition of fitted rubber
mats covering the entire surface may be a reasonable solution to mitigate the
problem.  

The Captain testified about the report and
reiterated that to prevent an accident, less slippery flooring and mats should
be utilized.  He also testified the mats
should have been on the galley deck before Pike fell and the mats= purpose was to make the deck less slippery.  Other people had also slipped on the slick
surface in the galley, including one individual who fell later on the same day
that Pike fell.  One seaman testified
there was only one other vessel in the Exxon fleet with the problem of glazed
tile on her decks.  This was a known
slippery condition aboard SeaRiver which supported an unseaworthiness finding
and contributed to the fall, especially when the vessel was not in calm seas.

The ship in question was designed for use in the
Mediterranean and was ill-suited for heavy seas.  At the time of the accident, the ship was
rolling twenty to thirty degrees, Apretty strong rolls.@  The ship=s records listed a Aslippery
deck surface@ as one of three root causes for and contributing
factors to the accident.  The other
causes and factors were identified as the ship=s
movement and the grease spill.  








SeaRiver=s own expert opined that a matted surface would
probably have been adequate to prevent Pike=s slip
and fall.   He opined that, had a more Aaggressive@ walking surface been provided, Pike would not have
slipped. 

Appellant=s first issue is overruled.

                                                   III.  Life-Care Planner as Expert

Appellant next complains the trial court erred by
failing to exclude the entire testimony of life-care planner, Dr. Robert
Voogt.  In its pre-trial motion to the
trial court, SeaRiver maintained that Voogt was not qualified and his testimony
was irrelevant and unreliable.  The trial
court, understanding that the motion was to exclude all of Voogt=s testimony, denied SeaRiver=s pretrial motion, although this was done late in
the trial.  The trial court noted that,
although he allowed Voogt to testify, he did sustain specific objections to
Voogt=s opinions. 
These objections and rulings are not part of SeaRiver=s issue, which is limited to the exclusion of Voogt
as an expert witness.








For an expert's testimony to be admissible, the
expert must be qualified, his opinion must be relevant to the issues in the
case, and his opinions must be based upon a reliable foundation.  Tex.
R. Evid. 702; Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 628
(Tex. 2002).  The admission or exclusion
of evidence is a matter within the trial judge's discretion.  Owens‑Corning Fiberglas Corp. v.
Malone, 972 S.W.2d 35, 43 (Tex.1998). 
To obtain reversal of a judgment based on error in the admission or
exclusion of evidence, an appellant must show that the trial judge's ruling was
in error and that the error was calculated to cause and probably did cause the
rendition of an improper Judgment.     Tex. R. App.  P. 44.1; Owens‑Corning
Fiberglas Corp., 972 S.W.2d at 43.  
A trial judge abuses his discretion when he acts "without regard
for any guiding rules or principles." 
Owens-Corning Fiberglas Corp., 972 S.W.2d at 43.  We must uphold the trial judge's evidentiary
ruling if there is any legitimate basis for doing so.  Id. 

Dr. Robert Voogt has worked in the field of
life-care planning for over twenty years and has thirty years of experience in
health care management for people with disabilities.  He operates his own facility for rehabilitation,
particularly for patients with neurological impairments.  He has a masters degree in rehabilitation
counseling and a doctorate in counseling. 
By definition, Dr. Voogt is an expert qualified to testify on the subject
before him at trial.  

During the course of his testimony, he gave testimony
concerning future medical costs based in part upon what the treating physicians
said, specifically Doctors Macielak, 
Miaczynski, and Concilus.  For
example, Dr. Macielak indicated that Pike would incur necessary medical
services ranging from $85 to $150 per year, plus $22,440 for a discectomy.  Dr. Concilus estimated that Pike would incur
medical expenses ranging from $150 to $200, plus injections every six weeks
costing $500 to $600 per shot. 
Medications were $6,739 per year, based upon Pike=s past usage. 
Using a United States Life Table, without objection, Pike had a
projected 22.5 year life expectancy.  

No objections were made to most of the specific
testimony of Dr. Voogt although a stipulation was entered indicating the
pretrial motion to exclude substituted for voir dire and Apreserves our objections to the admissibility of his
testimony as an expert witness.@  This we
understand, as did the trial judge, to mean the total exclusion of all
testimony by the expert witness.








SeaRiver argues Dr. Voogt is not a medical doctor,
yet he was allowed to testify as to the need for future medical care.  According to SeaRiver, Dr. Voogt is not
qualified to give an opinion on a person=s medical condition and medical future or predict
the care and treatment in the future. 
SeaRiver cites an unpublished federal district court opinion disallowing
testimony from Dr. Voogt.  Norwest
Bank, N.A. v. Kmart Corp., 1997 U.S. Dist. LEXIS 3426, 23‑24 (D. Ind.
1997).  However, even the federal
district judge in that case said:  

Accordingly, for all these reasons, Dr. Voogt's
"forecasts" of Mrs. Frick's present and future medical needs are not
admissible.  This leaves the other class
of opinions the plaintiffs wish to offer through Dr. Voogt: his cost
valuation of the life plan he outlined. 
Cost evaluation does not require medical expertise, and Dr. Voogt
plainly has the requisite experience to make his opinion of cost helpful to the
trier of fact.  It does not appear,
however, that those opinions are based on any evidence other than Dr. Voogt's
inadmissible opinions on the care Mrs. Frick will need.  It does not appear from the record before the
court that any health care provider will testify that Mrs. Frick will need the
course of treatment upon which Dr. Voogt based his cost valuations.  Dr. Voogt testified that he has not discussed
the plan's components with Mrs. Frick's treating physicians,  either before or after devising the
plan.  No other health care provider has
recommended all of the plan's components, and it does not appear that any other
health care provider recommended any single component of the plan other than
Mrs. Frick's current pharmaceutical prescriptions.  

 

See id.
(emphasis added).  Norwest is
plainly distinguishable.  As we read Dr.
Voogt=s testimony, his approach in this case avoided the
mistakes in Norwest.   He based
much of his cost evaluation upon the records and recommendations of the
treating physicians.  Unlike Norwest,
other qualified health card providers testified and related many of the
components of the health care plan. 
Further, unlike Norwest, SeaRiver also provided health care
evidence through its own life care expert. 
The pharmaceutical prescriptions were based upon Pike=s past treatment history, which Voogt delineated.

 Taken as a
whole,  Dr. Voogt demonstrated special
knowledge concerning most of the  very
matters on which he gave an opinion.  See
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 n.10 (Tex.
1998).








SeaRiver next argues Voogt=s opinions are unreliable.  Appellant selectively picks three items of
cross examination where Voogt admitted that there was no doctor recommendation
for the stated therapy.  However, no
specific objections were lodged to that testimony.  Appellant ignores pages of testimony where
Voogt  testified regarding the specific
basis and methodology for his opinion. 
Rule 702's reliability requirement focuses on the principles, research,
and methodology underlying an expert's conclusions.  See Tex.
R. Evid. 702.  Under this
requirement, expert testimony is unreliable if it is not grounded "in the
methods and procedures of science@ and is no more than "subjective belief or
unsupported speculation."  Daubert
v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993).  Expert testimony is also unreliable if there
is too great an analytical gap between the data the expert relies upon and the
opinion offered.  Gammill, 972
S.W.2d at 727.   In applying this
reliability standard, however, the trial court does not decide whether the
expert's conclusions are correct; 
rather, the trial court determines whether the analysis used to reach
those conclusions is reliable.   Id.
at 728.  

Here, Dr. Voogt used his own considerable expertise
to assess actual medical costs.  He
further consulted and confirmed with the treating physicians their opinions on
both the need for and costs of on-going treatment.  Under these circumstances, we cannot say the
trial court abused its discretion by refusing to exclude the totality of the
expert=s testimony.  
See  Gammill, 972 S.W.2d at
727; Robinson, 923 S.W.2d at 558; 
Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623,629 (Tex. 2002).[2]  This issue is overruled.

 








IV. 
Future Medical Expenses

SeaRiver maintains that the jury=s award of $1,000,000 in future medical and $15,000
in future disfigurement are excessive and not supported by the facts.  We agree in part.  The trial court instructed the jury to
consider Athe reasonable value, not exceeding actual cost to
Ella Pike, of medical care that you find from the evidence will be reasonably
certain to be required in the future . . . .@  The jury question was worded:  AMedical care that, in reasonable probability, Ella
Pike will sustain in the future.@  No objection
was raised nor any issue brought forward regarding the jury instruction or jury
question.  We are guided accordingly.








Texas courts of appeal have the power to review
excessiveness of damages and to order remittitur in FELA actions and, by
implication, in Jones Act cases as well. 
Maritime Overseas, 971 S.W.2d at 406.  The standard of review for an excessive
damages complaint is factual sufficiency of the evidence.  Id. at 407.  Texas follows the "reasonable
probability rule" for future damages for personal injuries.  Rosenboom Mach. & Tool, Inc. v.
Machala, 995 S.W.2d 817, 828 (Tex. App.BHouston
[1st  Dist.] 1999, pet. denied).  The jury can make its determination regarding
the amount of future medical expenses and care based on the injuries suffered,
the medical care rendered before trial, the progress toward recovery under the
treatment received, and the condition of the injured party at the time of
trial.  Id.  However, to sustain an award of future
medical expenses, the plaintiff must present evidence to establish that, in all
reasonable probability, future medical care will be required and what the
reasonable cost of that care will be.  Id.  It is within the jury's sound discretion to
determine what amount, if any, to award in future medical expenses.   Whole Foods Market Southwest, L.P. v.
Tijerina,  979 S.W.2d 768, 781-82
(Tex. App.BHouston [14th Dist.] 1998, pet. denied).   This standard of review, however, is
"not so nebulous that a reviewing court will uphold a jury award for
future medical expenses when there is no evidence."   Id. 

The jury had the opportunity to hear Dr. Paula
Miaczynski who testified to diagnosis and treatment of Pike=s injuries to her neck and leg, including a four to
five centimeter laceration to the bone. 
Dr. James Macielak, orthopedic surgeon, testified regarding his
examination of Pike and his treatment of her including X-rays and MRI.  He diagnosed two herniated or ruptured discs
in Pike=s neck at levels C 4-5 and C 5-6.   He recommended on-going treatment including
anti-inflammatory medication, muscle relaxants and physical therapy.[3]  He also recommended injections and future
surgery if Pike could not live with her condition.  Pike had not spontaneously recovered after
over one and one-half years of conservative treatment as of October 2003.  The trial was held in August 2004.  Dr. Voogt testified to a life care plan that
would cost $1,600,000.  Impairment ratings,
medical records and other documentary evidence was adduced.  Dr. Voogt also testified that Amaintenance@ and Asupport care@ included matters such as assistance with doing
chores around the house, cutting grass, handyman services, shoveling snow,
driving, cooking, and grocery shopping.








  SeaRiver
life planner Terry Arnold disagreed with much of Pike=s proposed treatment.  Appellant=s
expert Arnold stated it was not timely to propose a life plan because Pike was
in the middle of her treatment.  A life
care plan could not be written because Pike had not yet had surgery and,
potentially, her treatment could greatly change her outcome.  A video was taken of Pike showing her
painting a fence and mowing her yard, contrary to some of Pike=s evidence. 
Arnold also opined that areas of attendant care were no longer
necessary.

Also problematic to Pike=s future medical costs of $1,000,000 were the
apparent inclusion of support and maintenance care of $54,020 per year.  Cutting grass and handyman services are not
ordinary and necessary medical expenses. No medical testimony supported the
necessity for this, nor was it prescribed. 
Vocational therapy and rehabilitation are not medical expenses though
they were part of Dr. Voogt=s testimony. 
Pike was awarded substantial sums for past and future loss of earning
capacity.  We also note the unchallenged
jury findings of past physical impairment of $75,000 and future physical
impairment of $450,000.    In short, the
jury necessarily included elements of non-medical expenses in order to reach
its finding of $1,000,000 in future medical expenses.  As the trial court instructed, one element of
damages should not be included in any other element.

Based upon the evidence, projected medical expenses
were $120,577.50.  Medications based upon
past expenses were $6,739 annually or a total of $151,627.50  The cost of surgery was $22,440, for a grand
total of $294,645.








Pike argues that medical expenses may include
medical, nursing and custodial expenses. 
She cites Baptist Mem=l Hosp. Sys. v. Smith, 822 S.W.2d 67, 79 (Tex. App.BSan Antonio 1991, writ denied).  In that case, the San Antonio court upheld a
future award of medical of $1,324,512, which was rendered after a significant
remittitur by the trial court (over $1,000,000).  This case is not persuasive because the issue
considered was for "medical, nursing and custodial expenses in the
future."  Id. at 79.   Nursing and custodial expenses, as such,
were not submitted, nor are such elements present here.  Smith was able to stay in a nursing home
tolerably only because his two sisters and a niece came and stayed with him in
his permanent brain-damaged state and performed nursing services such as
tending to his incontinence, feeding him, and furnishing his daily
medication.  Id.   Furthermore, in this case the jury was
limited by instruction to the reasonable value of medical care, not exceeding
actual cost, reasonably certain to be required in the future.

We find the jury=s
award of $1,000,000 to be excessive and lacking factual sufficiency under the
limitations imposed by the trial court=s instructions. 
We accordingly order remittitur of $705,355.  See Ortiz v. Jones, 917 S.W.2d 770,
772 (Tex.1996) (courts of appeals must consider and weigh all of the evidence,
not just that evidence which supports the verdict).








In the second part of this issue, SeaRiver maintains
there is insufficient evidence to support the jury=s finding of $15,000 for future disfigurement.  In short, SeaRiver argues that although Pike
had a laceration on her shin which went down to the bone, it was healed and
that she would only receive a future award for scarring if she had
surgery.  Appellant cites Rosenboom
Mach. & Tool Co. 995 S.W.2d at 828. 
We find no direct support for appellant=s
position in this authority.  In contrast,
Pike argues that scarring is sufficient to support damages for disfigurement,
citing Wal-Mart Stores, Inc. v. Tinsley, 998 S.W.2d  664, 673 (Tex. App.BTexarkana 1999, pet. denied).   We agree.   The term "disfigurement" has been
defined as that which impairs the beauty, symmetry, or appearance of a person
or thing;  that which renders unsightly,
misshapened, or imperfect, or deforms in some manner.  Id. In addition, there are several
cases upholding past and future disfigurement awards for surgical scars.  Id. 
Dr. Miaczynski testified to a 4 to 5 cm leg laceration to the bone.  Dr. Macielak testified to the necessity of
future spinal surgery if Pike=s condition did not improve.  The jury=s finding is supported by the evidence.  The issue is overruled.

V. 
Offset








Finally, appellant argues she was entitled to an
offset to Pike=s damage recovery because the short and long term
disability payments made to her by Cigna were not a collateral source.  Five factors that may assist in
distinguishing fringe benefits from benefits intended to respond to legal
liability include:  (1) whether the
employee makes any contribution to funding of the disability payment; (2)
whether the benefit plan arises as the result of a collective bargaining
agreement; (3) whether the plan and payments thereunder cover both work‑related
and nonwork‑related injuries; (4) whether payments from the plan are
contingent upon length of service of the employee; and (5) whether the plan
contains any specific language contemplating a set‑off of benefits
received under the plan against a judgment received in a tort action.  Phillips v. Western Co. of N. Am., 953
F.2d 923, 932 (5th Cir. 1992).   Payment
by an employer into a fund for the purpose of providing a fringe benefit or
deferred compensation would make the benefit subject to the collateral source
rule.  Id.   This is contrasted with  payments made by the employer characterized
as a voluntary undertaking by the employer to indemnify itself against its
possible legal liabilities.  Id.  The five factors must not however be applied Awoodenly.@  Davis v.
Odeco, Inc., 18 F.3d 1237, 1244 (5th Cir. 1994).  Rather, in determining whether a benefit plan
that is wholly or partly funded by the tortfeasor is a collateral source, the
ultimate inquiry remains whether the tortfeasor established the plan as a
prophylactic measure against liability.  Id.

SeaRiver maintains that most of the evidence
concerning the five factors favor a finding that the payments by Cigna for
disability were not a collateral source. 
However, its own house counsel admitted that the plan was part of the
employees= fringe benefits. 
The benefits are Asold and marketed@ to
new employees as a benefit package.  In
answer to cross-examination questions as to whether there was any dispute that
the disability provisions were a fringe benefit for employees, house counsel
responded: AI think it is a fringe benefit for the employees,
yes.@  On this
record, we agree that these benefits are at least Aclosely akin to a fringe benefit(s)@ that are Apart‑and‑parcel of its employees'
compensation package.@  Id.
at 1245.  








Even though our review is de novo, SeaRiver is
further burdened by the fact that it neither requested nor obtained findings of
fact and conclusions of law.  Accordingly
we must presume that the trial court made findings necessary to support its
legal conclusions. See Point Lookout West, Inc. v. Whorton, 742
S.W.2d 277, 278 (Tex. 1987) (all questions of fact should be presumed found in
support of the judgment, and the judgment affirmed if it could be upheld on any
basis).  Furthermore, we must assume that
because SeaRiver only argues before us entitlement to an offset under the Jones
Act and not general maritime law, it did likewise to the trial court.  Thus the trial court was also empowered to
deny offset because of Pike=s alternate theory of recovery where no offset claim
was made.  Finally, although the Cigna
disability program provided an offset for long term benefits, no offset was
provided for short term benefits.  We
hold that appellant has not demonstrated reversible error when the trial court
refused to allow an offset.   SeaRiver
failed to establish that its payments made should be properly characterized as
a voluntary undertaking by the employer to indemnify itself against its
possible legal liabilities.  This issue
is overruled.

The judgment of the trial court is modified to
reduce future medical damages to $294,645. 
As modified, the judgment is affirmed.

 

DON WITTIG                          

Retired Justice

 

 

Memorandum
Opinion delivered and filed this

the
8th day of June, 2006.     

 

 











[1] Retired Fourteenth Court of Appeals Justice Don Wittig, assigned to
this Court by the Chief Justice of the Supreme Court of Texas pursuant to the
government code.  See Tex. Gov=t Code Ann. ' 74.003 (Vernon 2005). 

 

 

 

 

 





[2] 
SeaRiver apparently abandoned its argument concerning relevance.  In any event, the materiality of Pike=s future health care needs are
patent.





[3]  At the time of trial, Pike was
taking Celebrex, Robaxin, Zoloft, Vicodin, and Norflex.