In the Matter of the Complaint of MAG-NOLIA TOWING COMPANY, INC.

MAGNOLIA TOWING CO., INC., Plain-tiff-Third Party Defendant-Appellee, Cross-Appellant,

v.

ATCHISON, TOPEKA & SANTA FE RAILWAY CO., Southern Pacific Transportation Co., and the Galveston, Houston & Henderson Railroad Co., Defendants-Third Party Plaintiffs-Appellees, Cross-Appellants,

v.

MONSANTO CO. and Various Underwriters at Lloyds, Defendants-Third Party Plaintiffs-Appellants, Cross-Appellees.

v.

ALAMO BARGE LINES, INC., Third Party Defendant-Appellee, Cross-Appellant.

No. 84–2286.

United States Court of Appeals, Fifth Circuit.

July 8, 1985.

Rehearing Denied Aug. 27, 1985.

A. Gordon Grant, Jr., Stanley McDermott, III, New Orleans, La., for Various Underwriters at Lloyds.

Henry S. Morgan, Jr., Vinson & Elkins, Robert Jeffrey Coppock, Houston, Tex., for Monsanto Co.

W.T. Womble, Robert F. Maher, Houston, Tex., for Atchison, Topeka & Sante Fe Ry. Co.

John K. Meyer, Houston, Tex., for Alamo Barge Lines.

Robert C. Davee, Houston, Tex., for Magnolia Towing Co., Inc.

Before GEE, TATE, and HIGGINBOTHAM, Circuit Judges.

TATE, Circuit Judge:

This case arises out of an allision that occurred after midnight in early 1982, when the Tug BETH ("BETH"), with two barges in tow, struck the closed lift span of the Galveston Railway Causeway Bridge ("Galveston Bridge"). Following a bench trial on the issue of liability (bifurcated from a separate damage trial to be held later), the district court held, inter alia, that the lessees and operators of the Galveston Bridge were 80% at fault and that the BETH was 20% at fault because of the latter's excessive speed. Based upon *Union Oil Company of California v. THE SAN JACINTO*, 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972), we conclude (1) that the BETH's speed at the time was not a

causal factor of the accident because the BETH had no duty to anticipate that the lift span would not be raised for safe passage since the bridge tender twice informed the tug by radio that the lift span would be raised in time and since ample time had existed for the bridge tender to raise it, and (2) that the lessees and operators of the Galveston Bridge were therefore 100% at fault. Accordingly, we reverse.

## I. *Background*

The relevant facts are largely undisputed. On the morning of January 3, 1982, the tug BETH was pushing two barges loaded with an inflammable material and was proceeding eastward along the Intracoastal Waterway. Due to heavy fog, visibility at the time was approximately half a mile. Gonzales, the tug's pilot, kept watch and was at the helm in the wheel house, navigating the BETH by the tug's radar, which had a three-fourths mile range scale. His deckhand was seated behind and slightly above him in the tug, with the duty of maintaining a visual lookout. No lookout was posted on either of the two forward barges in tow.

Several hours later, at approximately 3:00 a.m., Gonzales detected Interstate 45 Causeway ("Interstate 45") on his radar. Interstate 45 lies some six-hundred feet west of, and runs parallel to, the Galveston Bridge. After Gonzales first detected by radar Interstate 45 some three-fourth's mile ahead, he began calling the Galveston Bridge on his radio and reduced his engines to half-speed, or about three miles per hour. Gonzales called the bridge seven times before he received an answer.

When the bridge tender finally answered, she told Gonzales that the lift span on Galveston Bridge was down but that she would raise it for him. When Gonzales asked her to repeat the message, she did so. Gonzales then informed the bridge tender that the tow was a little over a quarter of a mile away from the bridge and

would arrive "in a little bit." No further radio exchanges occurred between Gonzales and the bridge tender. The BETH did not blast her horn to sound either a fog signal or a bridge signal.

Following the radio exchange, ample time existed to raise the lift span for safe passage. As the BETH passed beneath Interstate 45 and approached the Galveston Bridge, however, the lift span remained closed. Until that point, Gonzales' view of the bridge was obstructed by Interstate 45, by the fog, and by the glare from floodlights attached to the bridge. When Gonzales cleared his passage of the Interstate 45 Causeway and first realized that the lift span was closed, the distance between the bridge and Gonzales in the tug's wheelhouse was about five-hundred feet.[1] Immediately thereafter, Gonzales threw the BETH's engines full astern. Moments later, the bow of the lead barge struck the bridge. Sparks ignited its cargo, causing a fire that destroyed the barge and its cargo, and also did substantial damage to the bridge.

An undisputed Coast Guard report indicates that, after the radio exchange, the bridge tender went to the restroom and never attempted to raise the lift span.

Following the accident, The Magnolia Towing Company, owner of THE BETH, petitioned the district court for exoneration from or limitation of liability.

We need not here describe the issues raised by the various answers, counterclaims, and cross-claims of the various parties; nor the district court's rulings upon most of the issues thereupon after bench trial, from which judgment all parties appeal. Our determination that the accident resulted solely from the fault of the Galveston Bridge operator moots all other issues raised by the various appeals, and resolves all issues involved in the judgment

---

1. The district court inadvertently stated that the bow of the lead tug was 500 feet distant at the time Gonzales realized the bridge had not opened. The uncontradicted testimony is to the effect of the statement in the text of the opinion.

entered after the hearing on liability from which this appeal is taken.[2]

The threshold central issue of this appeal concerns the district court's findings that the lessees and operators of the Galveston Bridge ("The Railroads")[3] were only 80% at fault because of the negligence of their bridge tender in failing to raise the bridge in accordance with her prior assurances to the BETH, and that the BETH was 20% at fault solely because of its excessive speed (three miles per hour) when the accident occurred. For reasons to be explained, we reverse the determination of fault on the part of the BETH and find the Railroads were 100% at fault.

## II. *The Speed of the BETH: Causal Factor?*

■ When the BETH's radar proceeding eastward picked up the Interstate 45 Causeway some three-fourths miles to the west, the vessel's pilot Gonzales reduced the engines to half-ahead, which gave a speed of about three miles per hour. The Galveston Bridge was approximately 600 feet *further* easterly of the Interstate Causeway. The Causeway obscured to the approaching tug the railroad bridge, both visually and by radar, so that neither Gonzales nor the posted lookout could observe that the railroad bridge had not been opened, as assured to them in radio communication by the bridge tender when the tug was approaching at least a quarter-mile away. Visibility was further obscured by the glow cast in the fog by the spotlight on the bridge tender's building. The same reason of fog interference prevented use of the spotlight on the tug to enhance visibility ahead.

In concluding that the BETH was partially at fault in the allision, the district court pointed out that, due to the reasons noted, the navigator and lookout of the BETH could not reasonably have observed the non-opened bridge sooner than they did but, had the BETH been proceeding at the possible slower speed of one and one-half miles per hour, the tug could have been stopped in time to avoid the allision. The court concluded: "Because the BETH proceeded at a speed which prohibited her from taking effective action to avoid allision, the Court concludes that the BETH was proceeding at an unsafe speed in violation of 33 U.S.C. § 2006," the only fault found on the part of the tug. (The district court thus rejected other contentions of the BETH's fault argued to it by the Railroads. *See* III *infra.*)

In holding the BETH 20% at fault, the district court thus found (1) that the BETH was proceeding at an unsafe speed in violation of 33 U.S.C. § 2006, because her speed at the time of the accident prevented her from avoiding the allision, as required by the "half-distance" rule (discussed *infra*); (2) that the BETH's statutory violation required application of the Pennsylvania Rule, *THE STEAMSHIP PENNSYLVANIA v. Troop*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), which provides that "the violator of a statutory rule intended to prevent allisions has the burden of proving not only that its transgressions were not a contributing cause of the allision but that they could not have been a cause of the allision," *Florida East Coast Railway Company v. Revilo Corporation*, 637 F.2d 1060, 1065 (5th Cir.1981); and that the BETH had failed to satisfy her burden of proof under the Pennsylvania Rule.

As guided by the principles enunciated in *Union Oil Company v. THE SAN JACINTO*, 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972), we find that the district court erred in holding, under the present facts, that the tug's speed was a causal factor

---

**2.** These include the district court's rulings: (1) that Magnolia (the owner of the tug) was in privity with the BETH and unable to claim limitation of liability and (2) that Monsanto (the owner of the cargo and owner pro hac vice of the barges) and Alamo (which had contracted with Monsanto to transport the barges, and which had subcontracted movement of the barges to Magnolia) were vicariously liable for

the torts of the BETH and for the damages caused by its fault.

**3.** The Atchison, Topeka and Sante Fe Railway Company, the Southern Pacific Transportation Company, and the Galveston, Houston and Henderson Railroad Company.

contributing to the allision that thus—because of the statutory speed violation—this statutory violation brought into play, under the Pennsylvania Rule, a burden upon the BETH to prove that its excessive speed could not have been a cause of the allision.

In *Union Oil*, the Supreme Court reversed a determination of the court of appeal that a vessel, found to be proceeding at excessive speed, was liable because it had failed to prove, as required by the Pennsylvania Rule, that such statutory violation could not have contributed to the accident. The facts in that case are generically similar to the present. A tanker and a tugboat with a tow were approaching each other on opposite sides of the Columbia River. After proceeding uneventfully for some distance, the tug's pilot became confused, turned sharply to port, and emerged from a fog bank only about 900 feet in front of the tanker, on a heading directly across the tanker's course. The tug pilot was able to turn the tug in time, but, as he did so, the barge in tow slipped away and slammed into the tanker. The parties agreed that the tug was negligent but disagreed about whether the tanker was negligent.

The issue in *Union Oil* turned upon whether the tanker was because of its speed at fault in the collision, thus bringing into play the burden under the Pennsylvania Rule of exculpating its speed as a contributing cause of the accident. The tanker (like the BETH in the present case) was proceeding at an "excessive" speed only in that it could not under foggy conditions come to a stop before colliding with an object when it became visually apparent through the fog. Resolution of this issue, in turn, depended upon whether the tanker's speed represented a statutory violation under the "half-distance" rule, or the "rule of vision," which by way of judicial gloss on the statutory speed regulation required that, in a fog, the vessel should proceed at a rate of speed as would enable it to stop before colliding with an object ahead of it.[4] Similarly, the present rule, 33 U.S.C. § 2006, held by the district court to have been violated by the BETH, is that a vessel must "proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions."

In *Union Oil*, the court of appeal had held that, under the half-distance rule (rule of vision) gloss on the statutory rule, the tanker's speed was excessive since she could not have stopped in time to avoid the collision when, unexpectedly, the tug emerged from the fog. The downriver-bound tug (which had been sighted by the tanker visually and by radar before the tug entered the fog on the opposite side of the river) had made a U-turn through the fog into the path of the upriver-bound tanker. In reversing the intermediate court, the Supreme Court held that the tanker's ex-

---

**4.** As summarized by *Union Oil, supra,* at 409 U.S. at 140, 93 S.Ct. at 371, the "half-distance" or "rule of sight" rule was "a well-recognized gloss" on the former Article 16 of the Inland Rules of Navigation, which provided, in pertinent part, that "[e]very vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at *a moderate speed,* having careful regard to the existing circumstances and conditions." 33 U.S.C. § 192 (emphasis added). The half-distance rule itself provides that, in a fog, "a moderate speed" is that " 'rate of speed as would enable [the vessel] to come to a standstill, by reversing her engines at full speed, before she could collide with a vessel which she should see through the fog.' " *Id., quoting THE NACOOCHEE,* 137 U.S. 330, 339, 11 S.Ct. 122, 125, 34 L.Ed. 687 (1890). As explained by the Court in *Union Oil,* the half-distance rule is based on the assumption that "[if]

two vessels, upon sighting each other, are proceeding at rates of speed such that each can stop before it reaches the [half-way] point at which the courses of the two intersect, collision is impossible." 409 U.S. at 144–45, 93 S.Ct. at 371.

Prior to the allision in the present case, Article 16 was replaced by 33 U.S.C. § 2006 (1980), which the district court applied in the present case to find that the BETH was travelling at an excessive speed under the circumstances. Insofar as the present case, the change in language is not relevant. The new rule, 33 U.S.C. § 2006, provides, in pertinent part: "Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions."

cessive-speed statutory violation was not a contributing cause of the accident, under the circumstances, and that it did not constitute statutory fault. *Union Oil, supra,* 409 U.S. at 145–46, 93 S.Ct. at 372. The reason for the half-distance rule (the rule of sight) was to avoid reasonably anticipatable possible hazards, and the rule (with its violation importing statutory fault) does not apply where it is "totally unrealistic to anticipate the possibility" of the particular hazard created by the other vessel's negligence. 409 U.S. at 145, 93 S.Ct. at 372.[5]

The Court thus concluded that "excessive" speed—in that the vessel is proceeding in foggy conditions at a rate at which it cannot stop in time to avoid colliding with a vessel or object in its path—does not constitute statutory fault as based upon a violation of the excessive-speed rule, unless the speed has "some relationship to the dangers against which that rule was designed to protect." *Union Oil, supra,* 409 U.S. at 146, 93 S.Ct. at 372. The statutorily protected-against hazards do not include those of which "it is totally unrealistic to anticipate the possibility" thereof. *Id.,* 409 U.S. at 145, 93 S.Ct. at 372.

For similar reasons, in the present case, the speed of the BETH (at half-speed of three mph instead of at its lowest navigable rate of one and one-half mph) was not a causal factor of the present accident. The district court found the speed to be excessive only because when "conditions finally enabled the pilot to ascertain that the bridge span remained closed, there was insufficient time for the tug BETH and its tow to be stopped or turned around to avoid the allision." However, the hazard here presented—that the bridge tender, operating in a dense fog, would twice say she would raise the bridge span, and then fail to do so—was a totally-unanticipatable possible hazard not within the intended protection of the excessive speed rule.

We pretermit whether under the competing theoretical computations the tug with

tow could or could not have avoided the allision at a speed of one and one-half mph (its lowest possible navigable speed). In either event, the BETH was not required to slow its speed, otherwise not shown to be excessive, on the utterly unanticipatable possibility that the railroad bridge might not be open (not reasonably observable before the tug cleared the Interstate 45 Causeway some 600 feet between tug and bridge) because the bridge tender, despite her repeated assurances, had not opened the bridge-span; any more than, upon receiving such assurances, the BETH was required to stop and to wait for the fog to clear, because of such unanticipatable possibility.

We conclude that, under the present circumstances, the speed of the BETH did not constitute statutory fault contributing to the accident. Accordingly, reversing the district court, we find the Railroads 100% at fault in this accident.

### III. *Other Fault of the BETH?*

[2] The Railroads argue that, even if the half-distance rule is inapplicable here, the BETH was nonetheless at fault (1) for failing to post a lookout with radio equipment on the lead barge instead of in the wheelhouse, (2) for failing to sound a fog signal, (3) for failing to sound a bridge signal, and (4) for even making the voyage on the night in question, given existing fog conditions. Although the district court entered findings of fact as to the first three conditions, and the fourth is not even raised by the evidence, it nevertheless determined that only the excessive speed of the BETH constituted fault on its part, thus rejecting the Railroads' contentions of the BETH's contributing fault in the other respects. The evidence reflects support for a conclusion that the lookout in the pilothouse (instead of at the bow of the lead tug) afforded better visual observation from its higher stance for proceeding through foggy conditions, visibility a half-

---

5. The Court stated that "[t]hose in charge of the navigation of the tanker cannot be faulted for not anticipating the tug's totally unorthodox ma-

neuver in darting across [the river]." *Union Oil, supra,* 409 U.S. at 146, 93 S.Ct. at 372.

mile (except, at this particular point, because of the obstructing Interstate Causeway), for the passage through the Intracoastal Waterway, and that, under the physical facts here involved and in view of the repeated radio assurances of the bridge tender, the failure of the BETH to sound fog or bridge signals could not have been a contributing cause of the accident.

In finding that the sole fault of the BETH under the circumstances was its excessive speed, despite having found as a fact the alleged lookout and signal violations by the Railroads, the district court thus determined that the alleged signal violations could not under the facts have contributed to the present accident. We do not find that factual determination to be clearly erroneous so as to be disturbed on appeal. *See* Fed.R.Civ.P. 52(a). As stated in *Anderson v. City of Bessemer City,* ——— U.S. ———, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985),

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Conclusion*

Accordingly, we reverse the determination of the district court that the BETH was 20% at fault in the accident, holding that the lessees and operators of the Galveston Bridge (*see* footnote 3 *supra*) were 100% at fault. We therefore REVERSE the judgment entered upon the bifurcated liability trial and REMAND for entry of judgment thereupon consistent with the holding of this opinion, as well as for further proceedings with regard to the bifurcated damages issues.

REVERSED AND REMANDED.