United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 28, 2003**

Charles R. Fulbruge III
Clerk

**Revised July 17, 2003**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 01-31323

_____

TRICO MARINE ASSETS INC.; TRICO MARINE OPERATORS INC.

Plaintiffs - Appellees

VERSUS

DIAMOND B MARINE SERVICES INC, ETC; ET AL

Defendants

DIAMOND B MARINE SERVICES INC, IN PERSONAM

Defendant - Appellant

_____

In Re:  In the Matter of the Complaint of TRICO MARINE OPERATORS
INC, as Owners/Operators/Owners pro hac vice of the OSV Cane River,
Praying for Exoneration From or Limitation of Liability
-----------------------------------------
TRICO MARINE ASSETS INC; TRICO MARINE OPERATORS INC, as
Owners/Operators/Owners pro hac vice of the OSV Cane River,

Petitioners - Appellees-Cross-Appellees

VERSUS

TEXACO EXPLORATION & PRODUCTION INC

Intervenor - Appellee-Cross-Appellant-Cross-Appellee

ACE USA, successor-in-interest

Intevenor - Appellee-Cross-Appellant

CIGNA

Intervenor - Appellee

VERSUS

DIAMOND "B" MARINE SERVICES INC

                    Claimant - Appellant - Cross-Appellee/Appellee

            JAMES ANDREW BENNETT

                                              Claimant - Appellant

                    VERSUS

LONNIE FONTENOT; WAYNE PAUL THIBODAUX, individually and on behalf
of their dependent minor child, Blake Milton Thibodaux, and their
dependant children, Angel Marie Thibodaux and Kelly Marie
Thibodaux; ALAN J. LEBLANC, individually and on behalf of their
dependant children Shere A LeBlanc and Michelle R Le Blanc

Claimants - Appellees-Cross-Appellants/Appellants-Cross-Appellees

_____

In Re:  In the Matter of the Complaint of DIAMOND B. MARINE
SERVICES INC, as Owner/Operator of CB Miss Bernice Praying for
Exoneration From or Limitation of Liability Regarding Collision of
25 March, 1999 with OSV Cane River
------------------------------------------
       DIAMOND "B" MARINE SERVICES INC, as Owner/Operator of
                        CB Miss Bernice

                    Petitioner - Appellant-Cross-Appellee/Appellee

                    VERSUS

       TRICO MARINE ASSETS INC; TRICO MARINE OPERATORS INC

                              Claimants - Appellees-Cross-Appellees

            MICHAEL A CHERAMIE; KENNETH B HELLER

                                        Claimants - Appellees

  LONNIE FONTENOT, individually and on behalf of their dependent
children, Amy and Jacob Fontenot; WAYNE PAUL THIBODAUX,
individually and on behalf of their dependant minor child, Blake M
Thibodaux, and their dependant children, Angel M Thibodaux and
Kelly M. Thibodaux; ALAN J LEBLANC; individually and on behalf of
their dependant children, Shere A leBlanc and Michelle R LeBlanc

                    Claimants - Appellees-Cross-Appellants/Appellants

                    VERSUS

JAMES ANDREW BENNETT

Claimant - Appellant

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

Before JONES, WIENER and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

On March 25, 1999, the C/B MISS BERNICE collided with the O.S.V. CANE RIVER in the fog in the Mississippi River below Venice, Louisiana. This collision led to three lawsuits: 1) a suit brought in admiralty by Trico Marine Assets, Inc. and Trico Marine Operators, Inc. (collectively "Trico") against Diamond B Marine Services, Inc. ("Diamond B"); 2) an exoneration/limitation action instituted by Trico; and, 3) an exoneration/limitation action instituted by Diamond B. These three cases were consolidated before the Federal District Court for the Eastern District of Louisiana.

The district court entered judgment in favor of Trico for damages totaling $43,167.09 against Diamond B and James A. Bennett (the captain of the MISS BERNICE). The court also rendered judgment in favor of Trico and against Diamond B and Bennett for full indemnity for any damages that would be assessed against Trico in any other proceeding. The district court also denied Diamond B's petition for exoneration or limitation of liability and awarded

damages to three injured Texaco Exploration and Production, Inc. (Texaco) employees: Wayne Thibodaux, Lonnie Fontenot and Alan LeBlanc (collectively "complainants"). In an amended judgment, the district court ordered that the complainants reimburse their employer, Texaco, for the amount of past medical expenses Texaco provided them.

Diamond B, Bennett and the complainants all appeal various aspects of the district court's order. Texaco has filed as an appellee-cross-appellant cross-appellee and Trico has responded as an appellee.

## BACKGROUND

On the morning of March 25, 1999, both the MISS BERNICE and the CANE RIVER were docked in Venice. The MISS BERNICE was chartered to Texaco, and Texaco ordered Bennett to pick up its employees (the complainants) at Garden Island Bay and return them to Venice. Although he knew visibility that morning was extremely restricted, Bennett departed from Venice without a lookout and without turning on his running lights. Furthermore, Bennett had never been trained to use the vessel's Si-Tex radar unit. The radar had been installed eleven months before the collision, but Bennett was absent that day and Diamond B left him to read the radar's manual and figure it out for himself. Bennett also decided to run the vessel at full speed, approximately 18 knots, even though the engine noise would make it difficult to hear the radio

4

or the fog signals of other vessels. Finally, he failed to check any of the MISS BERNICE's navigation equipment and ran at full speed without fog signals.

Although visibility remained very poor when Bennett arrived at Garden Island Bay, he decided to return to Venice immediately, still running at full speed and still without a lookout, running lights, or fog signals. The MISS BERNICE's engine noise was so loud that Bennett hooked up an external speaker to hear the radio. Bennett had complained about the engine noise problem in the past, but Diamond B had not done anything to remedy it.

As he approached the West Point Light, Bennett overtook a northbound supply boat, the O.S.V. ENSCO SCHOONER. Robert Rusho, the captain of that vessel, testified that he did not see the MISS BERNICE on the radar and that Bennett failed to radio him to make an overtaking agreement. Rusho was not aware that the MISS BERNICE was in the area until he heard her engines, which briefly slowed down as she cut around the starboard side of the ENSCO SCHOONER and then gunned back to full speed.

Continuing northbound at full speed, Bennett saw the CANE RIVER as a target on the MISS BERNICE's radar. Unfortunately, due to his lack of training and to the CANE RIVER's very slow speed, Bennett thought that the CANE RIVER was also northbound and that he was overtaking her. In reality, the CANE RIVER was southbound, and the two vessels were meeting. Bennett testified that he thought he announced on the radio that he was overtaking a northbound vessel,

5

but he said that he received no response.  Even if Bennett actually made that announcement, it is not surprising he received no response, as there were no northbound vessels in the area.

Despite the lack of either radio contact or an agreement to overtake the vessel, Bennett headed the MISS BERNICE on a direct collision course with the radar target for more than three full minutes without sounding any signals.  When the CANE RIVER came in sight, he was surprised to see her bow instead of the stern he was expecting.

Earlier that same morning, just as the MISS BERNICE was picking up the Texaco employees, the CANE RIVER was waiting for the fog to rise in Venice.  At about 7:30 a.m., Kenneth Heller, the ship's mate, was informed by another Trico vessel that the fog was lifting.  As visibility at the dock was clear, the CANE RIVER left the dock for an offshore platform at approximately 8:00 a.m.

As the CANE RIVER approached the Venice Jump, Heller made several radio announcements of his intention to turn southbound into the Mississippi River.  Two small northbound crewboats responded, and the boats agreed to pass starboard to starboard. The MISS BERNICE did not respond to the announcements.

As the CANE RIVER proceeded down river, Heller periodically announced the vessel's position over the radio and monitored its two radars, which were set on ranges of three-quarters of a mile and one-and-a-half miles.  At no time did the radar pick-up the MISS BERNICE.  At the same time, Lornell Castle, a deckhand and the

CANE RIVER's lookout, was in the wheelhouse looking and listening for other vessels.

Between the Upper Jump Shoal Buoy and the Lower Jump Shoal Buoy, the CANE RIVER encountered patchy fog, and visibility began to diminish. Heller reduced the CANE RIVER to bare steerage (*i.e.,* the lowest speed at which he could still control the vessel), which was approximately four knots, and began sounding fog signals every two minutes, as required by the Rules.

After taking these precautions, Heller had Castle summon Captain Michael Cheramie to the wheelhouse to assess the situation. Castle quickly did so and immediately resumed his post. Satisfied that there was no danger and that Heller had the situation under control, Cheramie went below deck to get his sunglasses and a cup of coffee. Before he could return, the collision occurred. No one aboard the CANE RIVER was aware of the MISS BERNICE's presence until seconds before the collision when Heller and Castle heard her engines and saw her emerge from the fog directly in front of the CANE RIVER.

At trial, Bennett testified that if he had held his course when he first saw the CANE RIVER, the boats might have narrowly missed one another. However, at the last second Bennett turned the MISS BERNICE hard to starboard, causing a bow-to-bow collision. At trial, Bennett admitted Heller could not have prevented the collision. He further testified that he did not know how he let

7

the situation develop and that he took away all of his and the CANE RIVER's options.

Even though he had already been injured in a previous accident for failing to wear his seatbelt, Bennett was not wearing a seatbelt at the time of this collision. As a result, he was thrown into the windshield and momentarily lost consciousness. Still at full speed and with no one at the wheel, the MISS BERNICE again struck the CANE RIVER in the port stern. After the first impact, Captain Cheramie took control of the CANE RIVER and maneuvered her in front of the MISS BERNICE to prevent her from hitting the "Fed 14," a tug and barge composite also heading south. The MISS BERNICE struck the CANE RIVER a third time and was finally brought under control when passenger Fontenot took her engines out of gear. The second and third impacts caused additional damage and injuries.

Captain Cheramie and his crew tied the MISS BERNICE to the CANE RIVER to keep the MISS BERNICE from sinking. Bennett and the Texaco employees were taken to shore by other vessels for medical attention. Captain Cheramie took both the CANE RIVER and the MISS BERNICE back to the dock in Venice.

The collision of the two vessels led to three lawsuits: 1) a suit brought in admiralty by Trico against Diamond B; 2) an exoneration/limitation action instituted by Trico; and, 3) an exoneration/limitation action instituted by Diamond B. These three cases were consolidated before the Federal District Court for the

Eastern District of Louisiana, and during the week of January 8, 2001, the district court conducted a non-jury trial of the claims of all parties in the three consolidated cases.

On September 28, 2001, the district court entered findings of fact and conclusions of law as well as a judgment in favor of Trico for damages totaling $43,167.09 against Diamond B and Bennett. The district court also denied Diamond B's petition for exoneration or limitation of liability and awarded damages to the three complainants in the following amounts: $125,037.41 to Wayne Thibodaux, $181,184.20 to Lonnie Fontenot and $295,816.63 to Alan LeBlanc. Though Bennett also sought damages, the court found that his injuries were caused solely by his own negligence in failing to wear a seatbelt and that he was therefore not entitled to recovery.

In an amended judgment filed November 20, 2001, the district court ordered that the complainants reimburse their employer, Texaco, for the amount of past medical expenses they received from Texaco. Fontenot was ordered to reimburse Texaco $132,229.31, LeBlanc was ordered to reimburse $51,975.35, and Thibodeaux was ordered to reimburse $48,553.74. In a second amended judgment, the district court ordered that the complainants also reimburse Texaco from the amount of the recovery they received in damages for compensation they received from Texaco during the pendency of the lawsuit. Finally, the district court denied the complainants motion for attorney's fees.

**DISCUSSION**

<u>Did the district court err by not applying the *Pennsylvania* Rule and placing the burden on Trico to prove that the collision could not have been caused by the CANE RIVER's violation of Rule 6 in order to exonerate it?</u>

Diamond B, Bennett and the claimants all assert that the district court committed a fundamental error by not placing the burden on Trico, as required by the rule of the *Pennsylvania*, to show that its negligence could not have caused the collision. Under the rule of the *Pennsylvania*, a party that is in violation of a rule intended to prevent allisions[1] is presumed to be at fault and bears the burden of proving that the violation did not cause the allision. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994). This Court has recognized that the rule of *The Pennsylvania* may apply in collision cases as well as in cases arising from an allision. *Acacia Vera Navigation Co. v. Kezia, Ltd.*, 78 F.3d 211, 216 (5th Cir. 1996); *see also* *Sheridan Transp. Co. v. Tug New York Co.*, 897 F.2d 795, 799-800 (5th Cir. 1990) (citing *Gele v. Chevron Oil Co.*, 574 F.2d 243 (5th Cir. 1978)).

---

[1]An allision is defined as the "running of one ship upon another that is stationary - distinguished from *collision*." Webster's Third New International Dictionary 56 (1971). A collision is defined as "the action or an instance of colliding, violent encounter, or forceful striking together typically by accident and so as to harm or impede." *Id.* at 446. Therefore, an allision occurs when a ship strikes a stationary object while a collision involves two moving vessels or objects. The *Pennsylvania* involved a collision.

10

These parties also claim that the district court erred in finding that the CANE RIVER was not negligent, asserting multiple grounds for its negligence such as moving forward in low visibility despite the "line of sight" rule, moving forward when the operators knew that the radar might not pick-up certain vessels and failing to maintain a proper look-out.  Trico answers that the **Pennsylavnia** rule does not apply because the district court never found that the CANE RIVER violated a statute and that a clear error analysis applies to this finding of fact.  Trico further asserts that they prevail under a clear error analysis as to the issue of negligence on the other alleged breaches of duty.

Though Diamond B argues for a *de novo* review of the district court's decision, Trico is correct and the decision is reviewed for clear error.  "In maritime actions, questions of fault are 'factual issues which cannot be disturbed on appeal unless the resolutions are clearly erroneous.'" **Brunet** 15 F.3d at 502 (quoting **Valley Towing Serv., Inc. v. S.S. Am. Wheat, Freighters, Inc.**, 618 F.2d 341, 346 (5th Cir. 1980)); *see also* Fed. R. Civ. P. 52(a).  In the present case, the district court was faced with deciding whether the CANE RIVER had violated various statutes intended to help prevent allisions.  The district court weighed the evidence before it, considered a number of factors, and concluded that the CANE RIVER did not violate any such statutes.  In **Brunet**, this Court applied a clear error analysis to a similar situation in which an

11

appellant argued that the rule of the **Pennsylvania** should apply because the appellee had violated various permits and regulations. *See also **Acacia Vera Navigation Co.***, 78 F.3d at 215-16.

Utilizing a clear error analysis, we find the appellants' arguments unconvincing. The appellants claim that the CANE RIVER was in violation of Rules 6 and 19, which govern the speed of a vessel and its speed in limited visibility. Rule 6 states:

> § 2006. Safe speed (Rule 6)
> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.
> In determining a safe speed the following factors shall be among those taken into account:
> (a) By all vessels:
>     (i) the state of visibility;
>     (ii) the traffic density including concentration of fishing vessels or any other vessels;
>     (iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
>     (iv) at night the presence of background light such as from shores lights or from back scatter of her own lights;
>     (v) the state of wind, sea, and current, and the proximity of navigational hazards;
>     (vi) the draft in relation to the available depth of water.
> (b) Additionally, by vessels with operational radar:
>     (i) the characteristics, efficiency and limitations of the radar equipment;
>     (ii) any constraints imposed by the radar range scale in use;
>     (iii) the effect on radar detection of the sea state, weather, and other sources of interference;
>     (iv) the possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
>     (v) the number, location, and movement of vessels detected by radar; and
>     (vi) the more exact assessment of the visibility

12

that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

33 U.S.C. § 2006. The district court considered all of these factors, and the provisions of Rule 19, and found that the CANE RIVER was operating at a safe speed.[2] The district court found, *inter alia*, that the CANE RIVER maintained a proper lookout by stationing Castle in the wheelhouse with the door open; that the radars of the CANE RIVER were monitored properly by Heller, and that the CANE RIVER maintained a proper radar lookout; that the CANE RIVER maintained a proper radio lookout and made required

---

[2]Rule 19 states, in relevant part:

§ 2019. Conduct of vessels in restricted visibility (Rule 19)
(a) Vessels to which rule applies
This Rule applies to vessels not in sight of one another when navigating in or near an area of restricted visibility.
(b) Safe speed; engines ready for immediate maneuver
Every vessel shall proceed at a safe speed adapted to the prevailing circumstances and conditions of restricted visibility. A power-driven vessel shall have her engines ready for immediate maneuver.
(c) Due regard to prevailing circumstances and conditions
Every vessel shall have due regard to the prevailing circumstances and conditions of restricted visibility when complying with Rules 4 through 10.
. . . .
(e) Reduction of speed to minimum
Except where it has been determined that a risk of collision does not exist, every vessel which hears apparently forward of her beam the fog signal of another vessel, or which cannot avoid a close-quarters situation with another vessel forward of her beam, shall reduce her speed to the minimum at which she can be kept on course. She shall if necessary take all her way off and, in any event, navigate with extreme caution until danger of collision is over.

13

security announcements over it;[3] and, that the CANE RIVER was proceeding downriver at bare steerage, which was the slowest possible speed it could run without losing control of the vessel.

As to this last finding, the appellants claim that it was error for the CANE RIVER to even be on the water in such a fog and that the district court should have found the CANE RIVER's speed to be unsafe under the "line of sight" rule, which describes the speed at which a vessel can safely travel as being the speed which allows the vessel to come to a halt within half the distance of its line of sight.[4] In rejecting applicability of the "line of sight" rule, the district court cited to **St. Philip Offshore Towing Co. v. Wisconsin Barge Lines, Inc.**, 466 F.Supp. 403, 409 (E.D. La. 1979), in support of the court's conclusion that, because the MISS BERNICE was traveling far in excess of the moderate speed required by law, the line of sight rule did not apply. Appellants claim that the district court misread **St. Philip Offshore Towing Co.**, but, even if true, this point is moot for two reasons.

First, the Supreme Court and this Circuit have recognized that the "line of sight" rule is not a rigid one that must be followed in all situations. As Trico points out, in cases as early as **The Pennsylvania**, the Supreme Court recognized that the speed at which

_____

[3]Apparently, Bennett could not hear these announcements over the noise of his vessel's engine.

[4]It is alleged that the CANE RIVER needed 200 feet to stop but only had 100 feet of visibility.

14

a vessel can safely travel in fog depends on the circumstances of each case. 86 U.S. at 133. In ***Union Oil Company of California v. The San Jacinto***, the Supreme Court reversed the Ninth Circuit's strict application of the "line of sight" rule because the fault alleged to have resulted from violation of the "line of sight" rule did not have "some relationship to the dangers against which that rule was designed to protect." 409 U.S. 140, 146 (1972). In other words, the "line of sight" rule was inapplicable, despite the vessels' traveling in excess of that speed, because the other vessel was negligent in a manner that could not have been anticipated. In ***In re Magnolia Towing Company***, 764 F.2d 1134 (5th Cir. 1985), this Circuit adopted the Supreme Court's ruling in ***San Jacinto***, stating that "[t]he reason for the half-distance rule (line of sight) was to avoid reasonably anticipatable possible hazards, and the rule (with its violation importing statutory fault) does not apply where it is totally unrealistic to anticipate the possibility of the particular hazard created by the other vessel's negligence." ***Id.*** at 1138 (internal quotations omitted). In the present case, the district court found that the MISS BERNICE's actions were just the sort of unanticipatable hazards and negligence that should pretermit application of the "line of sight" rule.

Second, even if the "line of sight" rule were applied and the rule of ***The Pennsylvania*** invoked, the appellants' argument would

15

fail because the district court alternatively found that the CANE RIVER could not have avoided a collision with the MISS BERNICE at any speed.  In fact, Bennett himself admitted that his last-second turn into the CANE RIVER took away all of the CANE RIVER's options.  Therefore, even if this Court were to adopt the appellants' argument that the "line of sight" rule should be invoked, it would not overcome the district court's determination that the collision was unavoidable due to the MISS BERNICE's negligence.

Ultimately, all of the appellants' assertions come down to contesting the district court's findings of fact.  Despite their contentions that a *de novo* standard should be used, we find that a clear error analysis is applicable.  Under such a standard, the district court had ample grounds on which to base its various findings of fact as to the proper maintenance of a lookout, proper radar lookout, proper radio lookout and safe speed.  The district court also found, as a factual matter, that the second and third impacts were not the fault of the CANE RIVER but rather the fault of the MISS BERNICE, which was advancing full throttle in a starboard direction without anyone at the helm, due to Bennett's having been rendered unconscious by the initial impact.  The district court's decision is therefore affirmed.[5]

---

[5]The appellants also argue that the CANE RIVER was negligent being out in such conditions because it could not safely travel within the line of sight rule.  Though language to support this proposition can be found in *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1470 (5th Cir. 1991), the discussion

16

<u>Did the district court err by denying Diamond B's claim to limit its liability to the value of the MISS BERNICE?</u>

Diamond B also claims that the district court erred in not limiting its liability to the value of its vessel as required by 46 U.S.C. § 183(a). Trico argues that the district court's finding was correct because Diamond B had privity or knowledge of the MISS BERNICE's unseaworthy condition and Bennett's negligent acts. Diamond B claims that even though there were navigational errors made, all errors that led to the collision were simply due to their "hands-off" approach to management, as allowed under *In re Kristie Leigh Enterprises*, 72 F.3d 479 (5th Cir. 1996).

This Court reviews a denial of limited liability for clear error. *Hellenic Inc. v. Bridgeline Gas Distrib., L.L.C.,* 252 F.3d 391, 394 (5th Cir. 2001). Under 46 U.S.C. § 183(a), a vessel owner may limit the liability incurred for any loss, damage or injury by collision to the "amount of value of the interest of such owner in such vessel, and her freight then pending." *Id.* However, if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had

---

the appellants cite to involved a review of many factors contributing to negligence in that particular case rather than a discussion of the applicability of the *Pennsylvania* rule, and this case was subsequent to this Court's ruling in *Magnolia* that the line of sight rule does not always apply to infer negligence. Additionally, the district court made findings that when the CANE RIVER left Venice, it had good visibility and it was en route to its destination when it encountered patchy fog, which limited its visibility.

no privity or knowledge of the unseaworthy conditions or negligent acts. *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1995). "[A] shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." *Pennzoil*, 943 F.2d at 1473. "Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss." *Id.* at 1473-74. Also, in situations resulting in loss of life or bodily injury, the knowledge of a seagoing vessel's master at the commencement of a voyage is imputed to the vessel's owner. 46 App. U.S.C. § 183(e).

The district court found that Diamond B had privity and knowledge of Bennett's negligence and participated in the negligence that caused the collision. The district court's findings were that Diamond B: 1) failed to provide a lookout; 2) failed to train Bennett to use a radar; 3) failed to evaluate the MISS BERNICE's seaworthiness or Bennett's competence (facts particularly relevant considering the excessive engine noise that may have helped cause the collision); 4) failed to inspect the vessel logs; 5) failed to employ a safety manager; and, 6) failed to provide safety training or safety manuals. The district court additionally found that "Diamond B knew the MISS BERNICE had operated in the fog and would continue to do so, yet employed a

18

captain without the proper qualifications and without adequate policies or procedures to guide him." Based on these findings, the district court had no difficulty in concluding that Diamond B should be denied any limitation on its liability.

Diamond B claims this was error. Diamond B contends that all it is guilty of is having a "hands-off" approach to management, which it claims is permissible under this Court's decision in *Kristie Leigh*. Diamond B is mistaken. Though this Court did recognize that a vessel owner could not be denied limitation of liability based merely on errors in navigation or other negligence by master or crew, *Kristie Leigh*, 72 F.3d at 481-482, the present case presents far more than mere navigational errors. Diamond B was aware that Bennett had trouble hearing the radio over the engine noise and that this noise also drowned out other vessels' fog signals; yet Diamond B sent him out anyway. Diamond B also sent him out without a lookout and with a radar system that Bennett had no training in how to use. Diamond B claims that Bennett had sufficient hands-on experience in using radar, but the fact that Bennett could not even tell which direction the CANE RIVER was traveling on radar indicates otherwise. In short, the facts found in this case go far beyond mere navigational errors. Diamond B knew, or should have known, that the MISS BERNICE was unseaworthy and that its captain was improperly trained. Therefore, the district court's decision is affirmed.

<u>Did the district court err in its allocation of damages owed to the claimants and Bennett?</u>

The claimants and Bennett argue that the district court erred in its allocation of damages. The claimants maintain that the district court violated the collateral source doctrine by taking the income they derived from Texaco into consideration, and that the amount of damages for medical expenses and future wages was in error. Bennett argues that he should not have been denied any damages based on his failure to wear a seatbelt.[6]

District courts enjoy "wide discretion" in awarding damages. ***Douglass v. Delta Air Lines, Inc.***, 897 F.2d 1336, 1339 (5th Cir. 1990). "The standard of review to apply in our inquiry into all findings of fact, including damage awards, is a clearly erroneous standard." ***Nichols v. Petroleum Helicopters, Inc.***, 17 F.3d 119, 121 (5th Cir. 1994). "Furthermore, mere disagreement with the

---

[6]Bennett also argues on appeal that Trico is not entitled to judgment against him because he was never properly served. Though Bennett was a party to the litigation from the outset, he claims that Trico's cross-claims against him, which Trico claims were served by mail through Bennett's attorney, were never received by himself or his attorney. Bennett claims that he made a motion to the district court to dismiss the claims against him by Trico but that the district court refused to hear his motion. This is not accurate. The district court denied Bennett's motion as untimely. Bennett has not argued on appeal that his motion was timely or cited any authority as to why the district court erred in denying his motion and his arguments on this point are therefore waived. "[I]ssues not raised or argued *in the brief* of the appellant may be considered waived and thus will not be noticed or entertained by the court of appeals." ***In re Tex. Mortgage Serv. Corp.***, 761 F.2d 1068, 1073 (5th Cir. 1985). (citation and internal quotation omitted).

district court's analysis of the record is insufficient, and we will not reverse a finding although there is evidence to support it, unless the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotations omitted).

A.   *Bennett's damages*

Bennett argues three points in support of his position that the district court erred in finding his injury was caused by his own negligence.  First, he argues that wearing a seatbelt was not required, and that the only reason one would wear a seatbelt is if waves or a rough sea would necessitate wearing one to keep from falling down.  Since the river was calm the day of the collision, Bennett argues, there was no reason to wear a seatbelt.  Second, Bennett claims that his injuries would not have been prevented by his wearing a seatbelt.  Despite the fact that he went through the front windshield head-first, Bennett claims that the real injury occurred from his brain hitting the side of his cranium, which he contends would have occurred with or without a seatbelt.  Third, Bennett argues that seamen have very little duty under maritime law to protect themselves and responsibility for his safety is mostly up to the vessel owner.

Bennett's first argument defeats itself.  If the purpose of wearing a seatbelt is to prevent the captain from falling down, then it is axiomatic that it must be there to prevent the captain

from being thrown through the windshield as well. Additionally, Bennett had already been in one collision in which he was not wearing a seatbelt. Bennett's second argument directly contradicts the district court's finding, which was based on medical testimony. We reject this argument under the clear error standard. Additionally, Bennett does not cite to a single case or piece of medical evidence to support either of his above two assertions.

As for Bennett's third argument, even the very cases he relies on recognize that a seaman has a duty to use reasonable care. ***Bobb v. Modern Products, Inc.***, 648 F.2d 1051, 1057 (5th Cir. 1981). Plowing through the water at top speed in the fog, without the benefit of a look-out or the ability to hear other vessels' fog signals or the radio by itself would violate any duty to take reasonable care. To do so without a seatbelt fastened is just another step beyond that reasonable threshold. We therefore affirm the district court's findings that Bennett's own negligence was the sole or proximate cause of his injuries, preventing his recovery.

B.  *The claimants' general, past and future medical damages*

Thibodeaux was injured when he was thrown forward in the MISS BERNICE and knocked unconscious, due to the collision. Thibodeaux was diagnosed with a head contusion and fractured ribs, and complained of neck pain, vision problems, and ringing in his ears, but apparently did not sustain any significant or permanent head injury. He was also diagnosed with a preexisting degenerative disc

disease at C5-6 and a longstanding osteophyte formation. About six months after the collision, an anterior cervical fusion was performed, after which Thibodeaux recovered and returned to work on May 11, 2000, just over 13 months after the collision. Thibodeaux was awarded $50,000 in general damages and $48,553.74 in past medicals, and no money was awarded for future medicals. The district court based its award of general damages on testimony from Thibodeaux and his treating physicians, the presence of preexisting conditions (which Thibodeaux attempted to conceal), and general damages awards made in prior cases. The court based its award of past medicals on the stipulated amount of past medicals attributable to the collision and paid by Thibodeaux's employer, Texaco.

Fontenot was injured when he fell while attempting to stand after the first collision and was further injured when he hit his head in the second impact. After the collision, Fontenot spent two weeks in the hospital, suffering from fractured ribs, a partially collapsed lung, a right kidney laceration, and neck pain. The district court found that Fontenot sustained the internal injuries in the first impact and the neck injuries in the second. In February 2000, Fontenot had a discectomy and anterior cervical fusion to correct his neck problems. In February 2001, Fontenot had a kidney removed to help relieve hypertension. The district court found that both Fontenot's neck problems and his hypertension were preexisting conditions that were aggravated by the collisions.

23

The district court awarded $100,000 in general damages for the first impact and $75,000 in general damages for the second impact. Fontenot was also awarded $106,045.11 for past medical expenses for internal injuries from the first impact and $26,184.20 for past medicals for cervical injuries from the second impact. Fontenot received nothing for future medical expenses, but was awarded $45,000 for future lost wages due to his cervical injury. The district court based its general damages award on testimony from Fontenot's treating physicians, the presence of preexisting conditions, Fontenot's failure to mitigate his own injuries, and general damages awards made in prior cases. The district court based its award of past medicals attributable to the collision on the stipulated amount of past medicals paid by Fontenot's employer, Texaco, as well as on the cost of the kidney removal surgery.

LeBlanc sustained injuries to his left knee and shoulder when he was thrown forward into a table during the first impact, then sustained injuries to his back when he was thrown backward during the second impact. LeBlanc spent two nights in the hospital and received arthroscopic surgery to his left knee and shoulder for the injuries sustained in the first impact. In April 2000, LeBlanc underwent lumbar surgery to correct a preexisting spondylolisthesis at L4-5 which the district court found was aggravated by the second impact. In December 2000, LeBlanc underwent a cervical fusion to relive neck pain, but the district court found that this condition was preexisting and unrelated to the collision. The district court

24

awarded LeBlanc $35,000 in general damages for injuries related to the first impact and $125,000 for injuries related to the second impact. LeBlanc was also awarded $35,721.24 for the past medical expenses related to the arthroscopic surgeries and $19,254.11 in past medicals for the lumbar surgery. The district court based its general damages award on testimony from LeBlanc's treating physicians, the presence of preexisting conditions, and general damages awards made in prior cases. The district court based its award of past medicals on the stipulated amount of past medicals attributable to the collision and paid by LeBlanc's employer, Texaco.

Though all three claimants allege that the district court's awards were inadequate in light of the nature of their injuries and awards from similar cases, the district court's awards appear to be soundly within the range of reasonableness, and the claimants have failed to show that the awards were clearly erroneous. The district court found that all three claimants had a pre-existing condition and that Thibodeaux had made attempts to conceal his pre-existing condition. The district court also heard detailed testimony about all three of the claimants' injuries and their prognosis before coming to its final damage award. The district court also supported all of its general damages awards with citations to cases in which similar injuries yielded similar damage awards. Though all the claimants make arguments that the amounts awarded should be higher, nothing in their briefs indicates that

25

the district court was clearly erroneous.

## C.  *The claimant's future lost wages*

All three claimants assert that the district court erred in the amounts it awarded for future lost wages.  The claimants argue that the court erred when it assumed they could return to work even though they could not, or assumed that they could return earlier than they actually could.  The district court did award future lost wages to Fontenot and LeBlanc but not to Thibodeaux because there was already a stipulation in the record that Thibodeaux had returned to work and was entitled to no future wage loss.  We do not find this to be in error.  Fontenot and LeBlanc claim the district court erred in finding that they had been cleared to return to work.  In fact, the district court based its decision about Fontenot on testimony contained in various doctors' reports and on the similarity of Fontenot's injury to Thibodeaux's.  As for LeBlanc, the district court did assess his future lost wages but found, based on expert testimony, that he would be able to return to a field of work and that he had transferrable skills.  Therefore it does not appear that the district court was clearly erroneous.

## D.  *The claimants' past lost wages*

The claimants assert that the district court erred because it considered payments made to the claimants by Texaco and reduced their award for past lost wages accordingly.  For the first six months after the collision, each of the claimants received a semi-

26

monthly check from Texaco covering (1) workers' compensation benefits, and (2) an additional amount under Texaco's short-term disability policy which was intended to make-up the difference between the compensation benefits and their ordinary wages. The district court found that these benefits actually constituted lost wages, a finding the claimants now contest. As the claimants offered no details about the benefits, the district court determined that it could not use the factors set out in *Phillips v. Western Company of North America*, 953 F.2d 923, 932 (5th Cir. 1992), and *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994)*,* to make a finding that the benefits were in fact collateral. The district court reduced the past lost wages award, despite the collateral source rule, on two grounds: (1) by introducing evidence of the past wages themselves, the claimants waived any objection; and, (2) if the claimants were permitted to receive wages from both Texaco and as damages, they would be receiving double recovery.

"The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor." *Davis*, 18 F.3d at 1243. "Sources of compensation that have no connection to the tortfeasor are inevitably collateral." *Id.* at 1244. This court reviews decisions concerning whether such benefits are collateral under a *de novo*

27

standard.  *Id.* at 1245.

The district court assumed that once a plaintiff introduces evidence of past benefits received, they have waived any objections about the benefits being used to reduce their past lost wages award.  The finding of waiver, however, is not completely accurate because the claimants did object to such benefits being considered under the collateral source rule and, in fact, the district court stated that it would not so consider the benefits.  It is true that the claimants stipulated to these amounts at trial, but because Texaco was seeking reimbursement for these amounts as an intervenor, the claimants were required to so stipulate by the Eastern District's Code of Professionalism, which states, in relevant part that "[attorneys] will cooperate with counsel and the court to reduce the cost of litigation and will readily stipulate to all matters not in dispute."  U.S. Dist. Ct. Rules E.D. La., Orders, Code of Professionalism (adopted Aug. 4, 1999).  We conclude, therefore, that it is factually inaccurate to find that the claimants waived any objection to these benefits being considered in calculating their lost wages simply because the stipulated amounts were introduced by the claimants.

Obviously, by introducing such evidence, the claimants had waived any evidentiary objections, but this is a different type of waiver altogether from waiving an objection to their benefits being reduced by the amount of their damages.  In fact, in *Parker v.*

28

*Wideman*, a panel of this Court, applying Florida law, stated that the plaintiffs do not waive this substantive right just because they introduce such evidence themselves. 380 F.2d 433, 436 (5th Cir. 1967) ("Thus, while the tender of such evidence by the defendant may be excluded on objection by the plaintiff, the introduction of such evidence by the plaintiff does not bar him from recovering expenses necessitated by the tort-feasor's negligence, even though the expenses were met by monies received from a collateral source.").[7] We therefore conclude that the claimants did not waive the collateral source rule objection.

As for the second basis for its decision, that to give the claimants credit for these benefits would give them a double recovery, we also find that the district court erred. The district court's concerns about double recovery are misplaced as is its seeming reliance on *Phillips* and *Davis*.[8] In those cases, this Court evaluated employee benefit programs to determine whether they were bargained for fringe benefits rather than benefits intended to

---

[7]In *Gates v. Shell Oil*, 812 F.2d 1509, 1513 (5th Cir. 1987), this Court noted that the collateral source rule operates to exclude evidence of collateral benefits because it may unfairly prejudice the jury. However, we noted that in ceratin circumstances, such evidence could be admitted for a limited purpose if there is little risk of prejudice and the court gives the jury a limiting instruction. *Id.* Thus, the evidentiary principle may be violated so long as it is still substantively enforced.

[8]The district court stated that it could not consider the factors of *Phillips* and *Davis* because the claimants offered no details about the nature of the benefits.

29

anticipate potential legal liability on the part of the tortfeasor. *Davis*, 18 F.3d at 1244. "Thus, we have recognized that it would be unfair to allow the plaintiff a double recovery when both the liability judgment and the collateral benefits are paid for by the **defendant**." *Phillips*, 953 F.2d at 931 (emphasis added). These concerns about double recovery were in the context of a tortfeasor/defendant having to pay twice, however, and not a third party paying the benefits as we have here. Therefore, there was no need to rely on these cases in the first place. Furthermore, there was no second recovery in the present case, because the claimants had to reimburse Texaco for the stipulated amounts of past benefits.[9] Also, even if the claimants had not reimbursed Texaco, the fact that the claimants may have gotten a second recovery would still be irrelevant because to hold otherwise would punish the claimants for having the foresight to establish and maintain collateral sources of income. *Davis*, 18 F.3d at 1244, n.21.

Considering the factors above, we find that, to the extent that the claimants past lost wages were reduced, the district court's decision was in error. We therefore reverse and remand so that the district court may enter a damages amount reflecting the stipulated amounts paid by Texaco, which were previously excluded.

---

[9] In fact, the end result of the district court's ruling was that the claimants had a "double loss" because the amounts were deducted from their damages award, but then, the claimants were forced to pay the stipulated amounts that were reduced out of their remaining damages amount.

<u>Did the district court err in denying the claimants request for attorney's fees?</u>

The claimants also argue that they were inequitably denied reimbursement from Texaco for attorney's fees. Under Louisiana law, employees are generally allowed to recover a portion of their attorney's fees if their employer intervenes in a suit against a third party tortfeasor. La. Rev. Stat. Ann. § 23:1103. As the district court pointed out, however, a claimant seeking to recover fees must introduce evidence sufficient to enable the court to make a proper apportionment. ***Rivet v. LeBlanc***, 600 So.2d 1358, 1363 (La.App. 1 Cir. 5/22/1992). As no such evidence was presented at trial or in connection with the hearing on the motion for attorney's fees, the district court denied the claimants' request. Though the claimants believe that the district court should have taken judicial notice of the claimants' enrichment of Texaco, they cite to no case law that supports this proposition. Additionally, § 23:1103(c) provides in part that "the intervenor shall only be responsible for a share of the reasonable legal fees and costs incurred by the attorney retained by the plaintiff," and "[t]he amount of the portion of attorney's fees shall be determined by the district court based on the proportionate services of the attorneys which benefitted or augmented the recovery from the third party." Despite the claimants' assertions that it was obvious that the Texaco attorneys rode on the coattails of their attorneys, they provided no evidence on which the district court could make any

sort of reasonable determination.  We therefore conclude that the district court's decision was correct.

<u>Did the district court err in finding that different injuries were caused by the different impacts?</u>

The claimants assert that the district court erred by finding that different injuries were caused by different impacts because there was no testimony to support such findings.  The claimants argue that, if this Court should find that the CANE RIVER is liable, then the injury determination has bearing on apportionment of liability.  However, as the district court placed no liability on the CANE RIVER and we affirm that decision today, this issue is moot.

**CONCLUSION**

Having carefully reviewed the record of this case and the parties' respective briefing, and for the reasons set forth above, we conclude that the district court's orders should be AFFIRMED in all parts except for that portion dealing with the claimants' past lost wages.  As to that part of the order, we REVERSE and REMAND so that the district court may enter a damages amount reflecting the stipulated amounts paid by Texaco, which were previously excluded.

**AFFIRMED in part and REVERSED and REMANDED in part.**